## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

PULSELINK SYSTEMS, LLC,

               Plaintiff,

     v.

HEWLETT PACKARD ENTERPRISE
COMPANY,

               Defendant.

Civil Action No. 2:26-cv-00475

**JURY TRIAL DEMANDED**

### COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff PulseLink Systems, LLC ("PulseLink" or "Plaintiff") brings this action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq*., including 35 U.S.C. § 271, against Hewlett Packard Enterprise Company ("HPE" or "Defendant") and alleges the following:

### NATURE OF THE CASE

1. This action arises under 35 U.S.C. § 271 for Defendant's infringement of PulseLink's U.S. Patent No. 8,565,230 ("the '230 Patent"); U.S. Patent No. 8,046,619 ("the '619 Patent"); U.S. Patent No. 7,941,677 ("the '677 Patent"); and U.S. Patent No. 8,289,845 ("the '845 Patent") (collectively, the "Asserted Patents").

### THE PARTIES

2. PulseLink is a Texas limited liability company with its principal place of business at 825 Watters Creek Blvd., Allen, Texas 75013.

3. On information and belief, HPE is a corporation organized under the laws of Delaware, with a principal place of business at 1701 East Mossy Oaks Road, Spring, TX 77389.

HPE may be served with process through its registered agent CT Corporation System, 1999 Bryan St., Suite 900, Dallas, TX 75201.

4.     On information and belief, on or about July 2, 2025, HPE acquired Juniper Networks, Inc. ("Juniper").

5.     HPE is a multinational company that develops, markets, sells, offers for sale, distributes, and supports enterprise networking products and services, including HPE Aruba Networking products and HPE Juniper Networking products. HPE's networking products include switches, wireless access points, SD-WAN products, networking software, and related support services.

6.     HPE markets, offers, sells, distributes, and supports its networking products through, for example, HPE websites and support portals, including HPE's online store and HPE Networking Support resources. HPE's online store identifies HPE Aruba Networking products including wireless devices, network switches, routers, networking software, HPE Aruba Networking Central, and HPE Aruba Networking EdgeConnect SD-WAN. HPE's networking support page identifies support resources for HPE Aruba Networking and HPE Juniper Networking platforms.

7.     HPE sells, distributes, integrates, and supports its products through, for example, channel partners and other intermediaries. HPE states that its partners "sell, manage, integrate, support, and deliver HPE solutions," and its partner materials identify partner resources for HPE Juniper Networking. *See* https://www.hpe.com/us/en/partners.html. On information and belief, HPE places the accused products into established distribution channels with the knowledge and expectation that those products will be sold, offered for sale, deployed, and used in the United States, Texas, and this District.

**JURISDICTION AND VENUE**

8.     This is an action for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code, including 35 U.S.C. §§ 271, 281, 284, and 285.

9.     This Court has subject matter jurisdiction over PulseLink's claims under 28 U.S.C. §§ 1331 and 1338(a).

10.    This Court has personal jurisdiction over HPE in this action because HPE has committed acts within the Eastern District of Texas giving rise to this action and has established minimum contacts with this forum through at least its office at 3001 Dallas Parkway, Frisco, TX 75034-8660, such that the exercise of jurisdiction over HPE would not offend traditional notions of fair play and substantial justice.  HPE directly and/or through intermediaries (including distributors, sales agents, and others), ships, distributes, offers for sale, sells, advertises, and/or uses its products (including, but not limited to, the products that are accused of patent infringement in this lawsuit) in the United States, the State of Texas, and the Eastern District of Texas.

11.    Venue is proper under 28 U.S.C. § 1400(b) because HPE has committed acts of infringement in this District and has regular and established places of business within this District. *TC Heartland LLC v. Kraft Foods Grp. Brands LLC,* 137 S. Ct. 1514, 1521 (2017).  For example, on information and belief, HPE maintains a regular and established place of business in this District at its Frisco, Texas office, located at 3001 Dallas Parkway, Frisco, Texas 75034-8660. Additionally, HPE publicly recruits for Frisco-based positions, including, for example, a Senior Solution Architect role in Frisco that is designated "Onsite" with an expectation that the employee will primarily work from an HPE office. HPE's labor-condition-application page likewise publicly lists Frisco, Texas as a location of HPE employment activity. See https://www.hpe.com/us/en/about/jobs/lca.html. On information and belief, HPE employees and agents regularly work from that Frisco office conducting HPE business on a continuous basis,

including sales, technical, and customer-facing business activities, such that the Frisco office is a physical, regular, and established place of business of HPE in the Eastern District of Texas.

12.     HPE has also purposefully availed itself of the Texas market, including this District, by offering HPE products and services through Texas public-procurement channels. For example, Texas Department of Information Resources contract DIR-TSO-4160 identifies Hewlett Packard Enterprise Company as the vendor and states that HPE offers servers, storage, networking, support, and other technology products and services through that contract. The contract identifies HPE's brand Aruba as an available brand and includes, among other categories, network components, wireless products, Power over Ethernet products, installation, networking services, technical services, training, and support. *See* https://dir.texas.gov/contracts/dir-tso-4160.

13.     On information and belief, HPE uses Texas public-procurement channels, including DIR contract vehicles and related reseller channels, to market, offer for sale, sell, distribute, install, support, and service HPE Aruba Networking and HPE Juniper Networking products in Texas and this District. On information and belief, HPE's participation in these procurement channels is directed at Texas public entities, including state agencies, local governments, public-education entities, and other public institutions, including entities located in the Eastern District of Texas.

## **THE ASSERTED PATENTS**

14.     PulseLink is the owner by assignment of the '230 Patent, owns all rights, title, and interest in the '230 Patent, and holds the right to sue and recover damages for infringement thereof, including past infringement.  The '230 Patent is entitled "Shared Virtual Tunnels Supporting MAC Learning in Communication Networks."   The application for the '230 Patent was filed on November 1, 2010, and was subsequently issued on October 22, 2013.  The '230 Patent also claims priority to U.S. Provisional Application No. 61/381,726, which was filed on September 10, 2010.

The listed inventors of the '230 Patent are Srikanth Keesara, Sakthivadivu Saravanaraj, Liming Sun, and Roger Lapuh. A true and correct copy of the '230 Patent is attached as **Exhibit 1**.

15.     PulseLink is the owner by assignment of the '619 Patent, owns all rights, title, and interest in the '619 Patent, and holds the right to sue and recover damages for infringement thereof, including past infringement.  The '619 Patent is entitled "Apparatus and Methods for Data Distribution Devices Having Selectable Power Supplies."  The application for the '619 Patent was filed on October 3, 2006, and was subsequently issued on October 25, 2011.  The listed inventors of the '619 Patent are Paul Benjamin Newland, Daniel Goodman, Wolf-Dieter Gross, and Stuart D. Conklin. A true and correct copy of the '619 Patent is attached as **Exhibit 2**.

16.     PulseLink is the owner by assignment of the '677 Patent, owns all rights, title, and interest in the '677 Patent, and holds the right to sue and recover damages for infringement thereof, including past infringement.  The '677 Patent is entitled "Apparatus and Methods for Managing Power Distribution over Ethernet."  The application for the '677 Patent was filed on January 5, 2007, and was subsequently issued on May 10, 2011.  The listed inventor of the '677 Patent is Randall J. Penning. A true and correct copy of the '677 Patent is attached as **Exhibit 3**.

17.     PulseLink is the owner by assignment of the '845 Patent, owns all rights, title, and interest in the '845 Patent, and holds the right to sue and recover damages for infringement thereof, including past infringement.  The '845 Patent is entitled "Assured Path Optimization."  The application for the '845 Patent was filed on September 27, 2007, and was subsequently issued on October 16, 2012.  The '845 Patent also claims priority to U.S. Provisional Application No. 60/938,156, filed on May 15, 2007, and U.S. Provisional Application No. 60/954,529, filed on August 7, 2007.  The listed inventors of the '845 Patent are Omar Baldonado, Sean Finn, Timothy

F. Kaye, Jose-Miguel Pulido, Faisal Siddiqi, and Ryan J. Tetreault. A true and correct copy of the '845 Patent is attached as **Exhibit 4**.

**COMPLIANCE WITH 35 U.S.C. § 287**

18.     PulseLink has never sold a product. PulseLink is unaware of any sale by a predecessor-in-interest or authorized third party in the United States of a product that practices any of the Asserted Patents. Therefore, PulseLink is unaware of any products that require marking under 35 U.S.C. § 287.

**HPE'S PRE-SUIT KNOWLEDGE OF THE ASSERTED PATENTS**

19.     Upon information and belief, HPE has had knowledge and notice of the Asserted Patents, and its infringement thereof, since before the filing of this Complaint. Upon information and belief, HPE, as a multinational information-technology and enterprise-networking company, regularly monitors developments in enterprise networking, switching, routing, tunneling, EVPN-VXLAN, wireless access points, SD-WAN, network optimization, and related technologies, and HPE monitored or was otherwise aware of the Asserted Patents, including due to their impact on HPE's plans for its own networking products and services.

20.     Further, prior to the filing of this Complaint, PulseLink attempted to engage HPE in good-faith licensing discussions related to the Asserted Patents, including by sending HPE correspondence on May 6, 2026 notifying HPE of the need to license the Asserted Patents, among others. PulseLink notified HPE of each Asserted Patent via email and Certified Mail, Return Receipt Requested. PulseLink informed HPE that PulseLink's patent portfolio, including the Asserted Patents, addressed foundational aspects of modern networking, communication, power-management, and network-optimization systems, and that meaningful alignment existed between aspects of HPE's products, including the accused products identified in this Complaint, and

6

technologies covered by the patent portfolio, including EVPN-VXLAN tunneling, dual-homed network architectures, MAC-learning optimization, PoE and multi-source power management, auxiliary-device power control, and assured path optimization. PulseLink specifically identified each Asserted Patent to HPE. PulseLink requested that HPE engage in licensing discussions.

21.    Despite having knowledge of the Asserted Patents prior to this Complaint being filed, upon information and belief, HPE did not undertake any serious investigation to form a good-faith belief as to non-infringement or invalidity of the Asserted Patents. Instead, HPE has continued to infringe one or more claims of each of the Asserted Patents.

22.    Alternatively, to the extent that HPE avoided or otherwise lacked actual knowledge of the Asserted Patents and its infringement thereof, HPE was willfully blind. Upon information and belief, to the extent HPE lacked actual knowledge of infringement prior to the filing of this action, HPE deliberately avoided learning of infringement despite subjectively believing that there was a high probability that it infringed PulseLink's patents, including the Asserted Patents, and was therefore willfully blind. Upon information and belief, HPE lacks adequate written policies disseminated to relevant employees regarding monitoring or avoidance of patent infringement by HPE and lacks adequate mechanisms for employees to report patents that they believe HPE may infringe. Upon information and belief, HPE and its employees subjectively understood that there was a high likelihood that patents covering innovations reflected in the Asserted Patents read on the accused products identified in this Complaint.

23.    At least as of May 6, 2026, and no later than the filing of this Complaint, HPE has had actual knowledge of the Asserted Patents and notice of its infringement thereof, and HPE has continued to willfully infringe.

24.    Therefore, upon information and belief, HPE's infringement of the Asserted Patents has been and continues to be willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, or flagrant, entitling PulseLink to increased damages under 35 U.S.C. § 284 and to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

**COUNT I: INFRINGEMENT OF U.S. PATENT NO. 8,565,230**

25.    PulseLink reasserts and incorporates herein by reference the allegations of all preceding paragraphs of this Complaint as if fully set forth herein.

26.    The '230 Patent contains 3 independent claims and 20 total claims.  Claim 1 reads:

1. A method for packet switching and routing in a computer network that provides dual homed access, the method comprising:

identifying a transport network, the transport network including switching devices that interconnect at least two separate access networks for transporting data traffic between end stations connected to the access networks, the transport network using tunnels to encapsulate and transmit data packets between respective switching devices;

identifying a first switching device that connects a first access network to the transport network;

identifying a second switching device that also connects the first access network to the transport network, the first and second switching devices providing the first access network with a dual homed connection to the transport network;

creating a shared virtual tunnel that connects the first switching device to a third switching device within the transport network, the shared virtual tunnel also connecting the second switching device to the third switching device within the transport network, the shared virtual tunnel defining a single virtualized source device address representing both the first switching device and the second switching device; and

in response to receiving a data packet from the first access network via the dual homed connection, encapsulating the data packet with the single virtualized source device address and transmitting the encapsulated data packet via the shared virtual tunnel to the third switching device, and

wherein said shared virtual tunnel extends from a first edge device and a second edge device in a dual-homed arrangement to a third edge device,

wherein said first edge device comprises said first switching device,

wherein said second edge device comprises said second switching device, and

wherein said third edge device comprises said third switching device.

27. The '230 Patent is directed to technical improvements in packet switching and routing for dual-homed computer networks. For example, claim 1 recites a specific networking method that identifies first and second switching devices providing dual-homed access, creates a shared virtual tunnel to a third switching device, defines a single virtualized source device address representing both dual-homed switching devices, and encapsulates/transmits packets using that shared virtual tunnel.

28. The claimed invention addresses concrete problems in EVPN tunneled transport networks. For example, in conventional EVPN dual-homing, packets from the same end station may arrive at a third transport device over either of two tunnels, causing the third device to repeatedly learn and relearn the same MAC address against different tunnels. This MAC-learning churn increases processing load and can cause packet delays, packet loss, and device failure. *See* Exhibit 1, '230 Patent, 2:66-3:25.

29. The '230 Patent invention solves that problem using a specific networking architecture. Namely the invention involves a shared virtual tunnel having a single virtualized source device address representing both the first and second switching devices in the dual-homed arrangement. The shared virtual tunnel also extends from the first and second edge devices to the third edge device, so the third switching device learns a single virtual tunnel rather than repeatedly switching between two independent tunnels. *See id.* at claim 1.

30. The claimed solution also improves operation of the network itself. For example, as the specification explains, the use of the shared virtual tunnel included in the claimed invention

9

prevents MAC-table churning, minimizes CPU loads, reduces constant table updates, and eliminates confusion in the MAC-learning process because the virtual tunnel is the same whether traffic originates at the first or second dual-homed transport device. *See id.* at 9:47-54; 10:54-11:4.

31.    The claimed invention was not well-understood, routine, or conventional as of the priority date. For example, conventional tunnel encapsulation protocols used source and destination addresses of transport devices. The claimed solution, however, creates a shared virtual address used by both dual-homed transport devices. *See id.* at 9:62-10:52. Accordingly, the claimed invention contains specific technical limitations that improve packet switching, routing, tunneling, and MAC learning in dual-homed networks.

32.    HPE has directly infringed, and continues to directly infringe, one or more claims of the '230 Patent under 35 U.S.C. § 271(a), either literally or under the doctrine of equivalents, at least by making, using, selling, offering to sell, and/or importing in or into the United States without authorization products and systems covered by one or more claims of the '230 Patent,[1] including, but not limited to switches supporting HPE Aruba's AOS-CX operating system, including but not limited to switches in the following product lines and other AOS-CX platforms that support the same accused EVPN-VXLAN/VSX logical VTEP functionality:

- HPE Aruba Networking CX 4100i Switch Series[2];

---

[1] Throughout this Complaint, wherever PulseLink identifies specific claims of an Asserted Patent that HPE infringes, PulseLink expressly reserves the right to identify additional asserted claims and products in accordance with the local patent rules. Specifically identified claims throughout this Complaint are provided for notice pleading only and are not presented as "exemplary" claims of an Asserted Patent.

[2] The specifically identified products and systems accused of infringement in this Complaint are based on PulseLink's understanding of the functions and features of these products and systems based on publicly available information, which may be incomplete.  PulseLink reserves the right to identify additional, and amend, the products and systems accused of infringement in accordance with the local patent rules.

- HPE Aruba Networking CX 6000 Switch Series;

- HPE Aruba Networking CX 6100 Switch Series;

- HPE Aruba Networking CX 6300 Switch Series;

- HPE Aruba Networking CX 6400 Switch Series;

- HPE Aruba Networking CX 8100 Switch Series;

- HPE Aruba Networking CX 8320 Switch Series;

- HPE Aruba Networking CX 8325 Switch Series;

- HPE Aruba Networking CX 8325H Switch Series;

- HPE Aruba Networking CX 8325P Switch Series;

- HPE Aruba Networking CX 8360 Switch Series;

- HPE Aruba Networking CX 8400 Switch Series;

- HPE Aruba Networking CX 9300 Switch Series;

- HPE Aruba Networking CX 9300S Switch Series;

- HPE Aruba Networking CX10000 Switch Series; and

- HPE Aruba Networking CX10040 Switch Series.

33.     By way of non-limiting example only, the HPE Aruba Networking CX 8325-32C, part of the HPE Aruba Networking CX 8325 Switch Series, can be configured for EVPN-VXLAN with VSX logical VTEP functionality in a computer network that infringes claim 1 of the '230 Patent as follows. HPE's use includes, but is not limited to, use of the '230 Accused Products in its own facilities, testing (*e.g.*, internal QA/regression testing, manufacture acceptance testing, trial runs by engineers, etc.), product validation, product improvement, customer and sales demos, training labs, professional services deployments, customer support and troubleshooting, and certification and validation.

34.      HPE's CX 8325-32C is a switch that can be used for packet switching and routing in a computer network that provides dual homed access.  In particular, HPE's CX 8325-32C uses the AOS-CX operating system, which can be configured for use in a network system that includes a pair of CX 8325-32C switches in a network system as a VSX (virtual switching extension) pair of switches used in an EVPN-VXLAN (Ethernet Virtual Private Network – Virtual Extensible LAN) overlay using one or more logical VTEPs (VXLAN Tunnel Endpoints).



*See* https://arubanetworking.hpe.com/techdocs/AOS-CX/10.17/HTML/vxlan/Content/Chp_EVPN/vxl-dis-l3-gat-exm-10.htm.

35.      The use of this network system identifies, through AOS-CX EVPN-VXLAN control-plane, configuration, and operational-state functionality, a transport network that includes

switching devices that interconnect at least two separate access networks for transporting data traffic between end stations connected to the access networks, using tunnels to encapsulate and transmit data packets between respective switching devices. For example, the use of this network system identifies the Aruba EVPN-VXLAN overlay fabric and supporting physical links as the transport network through EVPN control-plane discovery, VXLAN tunnel configuration, and VTEP operational state. The overlay network is created using VXLAN tunnels established between VTEPs within the leaf switches in the fabric. The VXLAN data plane network is a full mesh of VXLAN tunnels between leaf-switch VTEPs and server access switches support host attachment to the overlay by extending VLANs from the fabric leaf switches.

> **Overlay Connectivity and Addressing**
>
> The overlay network is created using VXLAN tunnels established between Virtual Tunnel Endpoints (VTEPs) within the leaf switches in the fabric. Loopback addresses assigned to establish route peerings are unique per switch and cannot be used as a VTEP IP when using VSX. A single logical VTEP per rack is defined by creating a dedicated /32 loopback interface common to both ToR peer switches. The interfaces are assigned automatically from a single subnet scope provided during the overlay guided setup.

*See* https://arubanetworking.hpe.com/techdocs/VSG/docs/050-dc-deploy/esp-dc-deploy-120-fabric-deploy/.

> **MP-BGP extension for EVPN**
>
> The following are some important EVPN route types:
>
> - **Ethernet auto-discovery route (Route 1)**—Advertises Ethernet Segment (ES) information in multihomed sites.
> - **MAC/IP advertisement route (Route 2)**—Advertises MAC, MAC/IP(v6) bindings (mapping to neighbor entry and/or host route) of the locally learned host.
> - **Inclusive Multicast Ethernet tag (IMET) route (Route 3)**—Advertises VTEP and VLAN mappings for automating VTEP discovery, VXLAN tunnel establishment, and VXLAN tunnel assignment.
> - **Ethernet Segment route (Route 4)**—Advertises ES and VTEP mappings.
> - **IP Prefix advertisement route (Route 5)**—Advertises BGP IPv4 or IPv6 unicast routes as IP prefixes.
>
> MP-BGP uses the route distinguisher (RD) field to differentiate BGP EVPN routes of different L2 domains and uses route targets to control the advertisement and acceptance of BGP EVPN routes. MP-BGP supports the following types of route targets:
>
> - **Export Route Target**—A VTEP sets the export targets for BGP EVPN routes learned from the local site before advertising them to remote VTEPs.
> - **Import Route Target**—A VTEP which receives the EVPN routes imports them if any of the route targets in the received route matches with any of the locally configured import route targets.

*See* https://arubanetworking.hpe.com/techdocs/AOS-CX/10.13/HTML/vxlan/Content/Chp_EVPN/mp-bgp-ext-evp.htm.



*See* https://arubanetworking.hpe.com/techdocs/AOS-CX/10.16/HTML/vxlan/Content/Chp_EVPN/EVPN_cmds/sho-evp-vte-nei.htm.

36.    The use of this network system identifies a first switching device that connects a first access network to the transport network. For example, the use of this network system identifies a first switching device as a first VSX peer, which connects the first access network on one side and the EVPN-VXLAN transport network on the other side.

14



*See* https://arubanetworking.hpe.com/techdocs/AOS-CX/10.17/HTML/vxlan/Content/Chp_EVPN/vxl-dis-l3-gat-exm-10.htm.

```
Step 4.2 - VSX LAGs to servers

    interface lag 1 multi-chassis
        no shutdown
        description server LAG
        no routing
        vlan trunk native 1
        vlan trunk allowed 10-11
        lacp mode active
        ! optional L4 hashinghash l4-src-dst
    !
    interface lag 2 multi-chassis
        no shutdown
        description server LAG
        no routing
        vlan trunk native 1
        vlan trunk allowed 20
        lacp mode active
    !
    interface 1/1/1
        no shutdown
        mtu 9000
        description link to server - LAG1 member
        lag 1
    !
    interface 1/1/2
        no shutdown
        mtu 9000
        description link to server - LAG2 member
        lag 2
```

*See* https://arubanetworking.hpe.com/techdocs/AOS-CX/10.14/HTML/vxlan/Content/Chp_EV-VX-MF/ex_fab1-config.htm.

37.     The use of this network system identifies a second switching device that also connects the first access network to the transport network, the first and second switching devices providing the first access network with a dual-homed connection to the transport network.  For example, the network system identifies a second switching device (*e.g.*, "Leaf1'" below) as the second Aruba VSX peer in the Aruba CX 8325 VSX pair. The VSX presents the VSX pair as a single device to layer 2 clients, that the VSX pair provides an MCLAG link toward the clients, and the clients see the VSX pair as a single switch providing a redundant L2 connection. The access switches are configured as VSX pairs to support Layer 2 MC-LAG connections to downstream data center hosts and show a host-facing multi-chassis LAG configured with no routing. In the data path, both VSX peers act as a single logical VTEP and that both VSX peers are configured with a common Logical VTEP. Accordingly, the second VSX peer also connects the same first access network to the transport network, and the first and second VSX peers together provide the first access network with the claimed dual-homed connection while separately participating in the EVPN-VXLAN transport network.



*See* https://arubanetworking.hpe.com/techdocs/AOS-CX/10.15/HTML/vxlan/Content/Chp_EVPN/evp-vsx-sup-10.htm.

38.    The use of this network system creates a shared virtual tunnel that connects the first switching device to a third switching device within the transport network, the shared virtual tunnel also connecting the second switching device to the third switching device within the transport network, the shared virtual tunnel defining a single virtualized source device address representing both the first switching device and the second switching device. For example, the network system uses Aruba's EVPN-VXLAN logical VTEP functionality so that the first and second switching devices (*e.g.*, "Leaf1" and "Leaf1`") present a shared logical VTEP tunnel identity to a third switching device (*e.g.*, "Leaf2" or "Leaf3") across the EVPN-VXLAN transport network. In the data path, both VSX peers act as a single logical VTEP and both VSX peers are configured with a common Logical VTEP. Accordingly, the network system creates the claimed shared virtual tunnel through the single logical VTEP/anycast VXLAN source identity used by both VSX peers for VXLAN tunnel connectivity to the remote Aruba EVPN-VXLAN switch/VTEP, with that common source identity functioning as the single virtualized source device address.

17



*See* https://arubanetworking.hpe.com/techdocs/AOS-CX/10.15/HTML/vxlan/Content/Chp_EVPN/evp-vsx-sup-10.htm.

39.    The use of this network system, in response to receiving a data packet from the first access network via the dual-homed connection, encapsulates the data packet with the single virtualized source device address and transmits the encapsulated data packet via the shared virtual tunnel to the third switching device, and where the shared virtual tunnel extends from a first edge device and a second edge device in a dual-homed arrangement to a third edge device, and where the first edge device comprises said first switching device, and where the second edge device comprises the second switching device, and where the third edge device comprises the third switching device. For example, a host (*e.g.*, "VM" left) transmits a data packet to a communicating peer (*e.g.*, "VM" right) via a dual-homed arrangement with the first access network. In response to receiving the data packet from the first access network, the ingress edge/switching device (*e.g.*, "Leaf1" or "Leaf1`"') encapsulates the packet using the common Logical VTEP/anycast VXLAN source identity as the claimed single virtualized source device address and transmits the

18

encapsulated packet to the remote Aruba EVPN-VXLAN switch/VTEP through the shared virtual tunnel defined by that common logical source identity. For traffic initiated from a host toward a remote host, at Switch-1 ingress the packet from the host is still a normal VLAN packet, and at Switch-1 egress that packet has been encapsulated into a VXLAN UDP tunnel packet. In EVPN VSX support, both VSX peers act as a single logical VTEP in the datapath and that the same VTEP IP must be configured on both VSX peers. Aruba's configuration example likewise states that the VXLAN tunnel source IP address is the anycast common IP address of the loopback1 of the VSX primary and secondary and shows that common IP configured as the source ip on interface vxlan 1. Accordingly, when a packet is received from the first access network over the dual-homed VSX/MC-LAG connection, either ingress VSX peer encapsulates the packet using the same common Logical VTEP/anycast VXLAN source identity as the single virtualized source device address and transmits the encapsulated packet to the remote Aruba EVPN-VXLAN switch/VTEP through the shared virtual tunnel defined by that common logical source identity.



*See* https://arubanetworking.hpe.com/techdocs/AOS-CX/10.15/HTML/vxlan/Content/Chp_EVPN/evp-vsx-sup-10.htm.

19

40. To the extent any step of the claimed method is performed by HPE's customers, end users, partners, distributors, consultants, service providers, or other third parties, such performance is attributable to HPE. HPE controls or directs the configuration, deployment, operation, validation, support, and troubleshooting of the '230 Accused Products through its AOS-CX software, EVPN-VXLAN and VSX configuration requirements, product documentation, deployment guides, technical-support materials, training materials, professional-services deployments, certification and validation activities, and customer-support practices. HPE conditions customers' and end users' receipt of the benefits of the accused EVPN-VXLAN/VSX logical VTEP functionality on configuring and operating the accused products in the manner specified by HPE, including the manner and timing of the claimed packet switching, tunneling, encapsulation, and transmission operations. HPE receives a benefit from such use, including revenue from sales, licenses, support, services, maintenance, and continued customer adoption of the '230 Accused Products. Accordingly, all steps of the asserted method claims are performed by HPE or are attributable to HPE under HPE's direction or control.

41. On information and belief, each of the '230 Accused Products has been available for purchase in the United States, including but not limited to, directly from HPE, through HPE's website, and/or through HPE-authorized Americas distributors. By way of example only, the CX 6000 24p 10M/100M/1G Class4 PoE 4p SFP 1G 370W Switch has been available for purchase in the United States, including but not limited to through HPE's website:

20



*See* https://buy.hpe.com/us/en/networking/switches/fixed-port-l3-managed-ethernet-switches/hpe-aruba-networking-cx-6000-24p-10m-100m-1g-class4-poe-4p-sfp-1g-370w-switch/p/r8n87b.

42.    HPE's infringement of the '230 Patent is and has been knowing, deliberate, and willful, at least as of May 6, 2026, and no later than the filing date of this Complaint. In addition, Juniper knew of the published application leading to the '230 Patent at least as of January 8, 2015, when Juniper included U.S. Patent Publication No. 2012/0063451 in a January 8, 2015 Information Disclosure Statement during prosecution of Juniper's U.S. Patent No. 10,848,414. On information and belief, as part of HPE's acquisition of Juniper, HPE had access to and control over Juniper's patent prosecution records, technical knowledge, product knowledge, and business operations relating to Juniper networking products.

21

43.     Since at least as of May 6, 2026, and no later than the filing date of this Complaint, HPE, knowing the '230 Accused Products infringe the '230 Patent and with specific intent for others to infringe the '230 Patent, has induced infringement of, and continues to induce infringement of, one or more claims of the '230 Patent under 35 U.S.C. § 271(b), either literally and/or under the doctrine of equivalents, at least by actively inducing others, including its distributors, customers, end-users, and/or other third parties, to make, use, sell, offer to sell, and/or import in or into the United States without authorization the '230 Accused Products. HPE knowingly and intentionally instructs its distributors, customers, end-users, vendors, labs, service providers and contractors, training partners and instructors, partners, consultants, and/or other third parties to infringe at least through user manuals, product documentation, and other materials, including without limitation those located on HPE's website. HPE knowingly and intentionally encourages, instructs, causes, and facilitates infringement through the use, importation, sale, license, offer for sale, deployment, configuration, support, and operation of the '230 Accused Products by its distributors, customers, end users, vendors, labs, service providers and contractors, training partners and instructors, partners, consultants, and/or other third parties, and through end users' use of the '230 Accused Products in the United States.

44.     Since at least as of May 6, 2026, and no later than the filing date of this Complaint, HPE further induced infringement by encouraging its distributors, customers, end-users, vendors, labs, service providers and contractors, training partners and instructors, partners, consultants, and end users of the '230 Accused Products in the United States through marketing, providing information such as detailed installation guides that promote their features, specifications, and applications; and providing technical documentation including user guides, and reference manuals

22

describing how to implement, optimize, and test applications; and by providing commercial and customer support services.

45. PulseLink has sustained and is entitled to recover damages as a result of HPE's past and continuing infringement, in an amount adequate to compensate for HPE's infringement, but in no event less than a reasonable royalty for the use made of the invention, together with interest and costs as fixed by the Court.

46. HPE's infringement of the '230 Patent is and has been knowing, deliberate, and willful, since at least as of May 6, 2026, and no later than the filing date of this Complaint, Despite HPE's knowledge of the '230 Patent since at least May 6, 2026, HPE continued and continues to commit acts of direct and indirect infringement despite knowing its actions constitute infringement of the valid and enforceable '230 Patent, despite a risk of infringement that was known or so obvious that it should have been known to HPE, and/or even though HPE otherwise knew or should have known that its actions constituted an unjustifiably high risk of infringement of that valid and enforceable patent.

47. Under these circumstances, HPE's conduct is and has been egregious. HPE's knowing, deliberate, and willful infringement of the '230 Patent entitles PulseLink to increased damages under 35 U.S.C. § 284, and attorneys' fees and costs from prosecuting this action under 35 U.S.C. § 285.

## COUNT II: INFRINGEMENT OF U.S. PATENT NO. 8,046,619

48. PulseLink reasserts and incorporates herein by reference the allegations of all preceding paragraphs of this Complaint as if fully set forth herein.

49. The '619 Patent contains 5 independent claims and 30 total claims.  Claim 1 reads:

1. A network apparatus comprising:

a data distribution device having a first input configured to receive data distribution device operating power and data, a second input configured to receive only data distribution device operating power, a first output configured to output external device operating power and data and a second output configured to output data without external device operating power;

a first sensor for determining whether a first power signal is present at said first input;

a second sensor for determining whether a second power signal is present at said second input; and

a controller operably connected to said first sensor and said second sensor,

wherein, when said controller determines that a first power signal is present at said first input and a second power signal is not present at said second input, electrically connecting said first input to said first output, when said controller determines that a first power signal is not present at said first input and a second power signal is present at said second input, electrically connecting said second input to said first output.

50.     The '619 Patent addresses a concrete technological problem in networking power management. In particular, "problems can arise if the PoE source is overburdened by too many devices drawing more current tha[n] the PoE supply can provide, or when one or more devices malfunction and draw too much power. This can cause the PoE source to malfunction and may reduce device and network system reliability." Exhibit 2, '619 Patent at 1:28-33. Accordingly, "there [was] a need for devices and methods" that "have the ability to select power from a plurality of power sources to improve reliability and ease power consumption over PoE sources." *Id.* at 1:46-50.

51.     The '619 Patent discloses a technological solution to that problem, wherein the data distribution device may select operational power either from a remote data distribution device over the same connection used for data or from a dedicated line connected to an independent power supply. *Id.* at 1:59-2:3. Figure 3 of the '619 Patent also discloses a concrete hardware implementation for carrying out that selection.



Fig. 3

*Id.* at Fig. 3.

52.     The '619 Patent's specification further describes this concrete hardware implementation that is claimed in claim 1:

> Over uplink port 320, power may be received using IEEE 802.3af PoE standards, which can be supplied by closet gigabit switch 210. If power is present at this port, power detector 350, which may connected to outputs coming from PoE controller 360, will sense the power signal from uplink port 320, and send a signal notifying process controller 340 that the closet gigabit switch 210 is providing a power signal. Similarly, power detector 355 may sense a power signal provided by independent power supply 115, which may be fed power through standard A/C wall socket over plug and connector 390. Power sensor 355 will then send a signal to process controller 340 that independent power supply 115 is providing a power signal which may be used for operational power.
>
>      . . .
>
> Process controller 340 may then exercise various logic to determine which power supply to select. Such logic may be in the form of a program stored in on-board memory (not shown) within the process controller. Process controller and memory may be of any type known to one of ordinary skill in the art, and include. One form of logic which may be used could be to have process controller 340 use either PoE power from uplink port 320, or power from independent power supply 115, if only

one of which is present. If both are sources are present, process controller 340 may select power from independent power supply 115 in order to minimize any aggregate PoE power draw closet gigabit switch 210 may experience.

*Id.* at 8:3-33.

53.     The '619 Patent describes a particular arrangement of inputs, outputs, detectors, controller logic, and switching hardware designed to solve a specific technological problem in networking power management. This is a specific machine-level implementation for power-source selection in a network device.

54.     HPE has directly infringed, and continues to directly infringe, one or more claims of the '619 Patent under 35 U.S.C. § 271(a), either literally or under the doctrine of equivalents, at least by making, using, selling, offering to sell, and/or importing in or into the United States without authorization products covered by one or more claims of the '619 Patent, including, but not limited to:

- Network devices having a PoE-in port, an external power adapter input, a PSE Ethernet output port, and a non-PSE Ethernet output port, and a power source selection feature, including but not limited to model numbers AP11D; AP22D; AP-205H; AP-505H; AP-605H; and AP-725H;

- Network switches having a PoE-in port and an external power adapter input, and a power source selection feature, including but not limited to AP11D; AP22D; AP-205H; AP-303P; AP-503H; AP-505H; AP-514; AP-605H; AP-723H; and AP-725H; and

- other similarly functioning HPE devices (collectively, the "'619 Accused Products").

26

55. By way of non-limiting example only, HPE's AP-505H access point infringes claim 1 of the '619 Patent as follows.

56. HPE's AP-505H access point is a network apparatus that includes an 802.11ax radio, one uplink port and four Ethernet ports.

57. The AP-505H includes a data distribution device that includes a PoE-in Ethernet port at port E0, which is an input configured to receive device operating power and data, and a 48V DC power input, which is an input configured to receive only device operating power.

 

## Power

Ethernet port E0 supports PoE-in (AP is a PoE-PD device), allowing the device to draw power from compliant PoE power sources. If PoE is not available, the access point has a single 48V DC power input to support the AC-to-DC power adapter kit (sold separately). When both PoE and DC power sources are available, the DC power source takes precedence. Enabling IPM will remove all restrictions initially. It then applies configurable restrictions when needed, indicated by the amber LED.

## Electrical

- Ethernet:
  - E0: 100/1000/2500 Base-T auto-sensing Ethernet RJ45 interface
  - IEEE 802.3u (100 Base-T). IEEE 802.3ab (1000 Base-T), IEEE 802.3bz (2500 Base-T)
  - Power over Ethernet IEEE 802.3bt, 802.3at, or 802.3af
- Power:
  - 48V DC power interface, support powering through AC-to-DC power adapter
  - Maximum power consumption (excluding USB): Refer to datasheet

*See* HPE Aruba Networking AP-505H Access Points Installation Guide at 4, 8, 10 (available at https://arubanetworking.hpe.com/techdocs/hardware/aps/ap505h/ig/AP-505H_Install_Guide.pdf).

58.     The data distribution device also includes PSE-enabled ports E1 and E2, which are outputs configured to output external device operating power and data, and Ethernet ports E3 and E4, which are outputs configured to output data without external device operating power.



**Ethernet Ports**

The AP-505H access points are equipped with one active Ethernet port E0, shown in Figure 2. The port is 100/1000/2500 Base-T, auto-sensing MDI/MDX, which supports uplink connectivity when linked by an Ethernet cable. Refer to Figure 5 for a detailed port pin-out. The AP-505H access points support downlink network connectivity through E1-E4 Ethernet ports. The ports are 10/100/1000Base-T auto-sensing MDI/MDX. Ports E1 and E2 have power sourcing capability (PSE) to supply power to any compliant 802.3af (class 0-3) or 802.3at (class 4) PD device.

*Id.* at 4, 6.

59.     The data distribution device also includes a first sensor for determining whether a first power signal is present at the first input and a second sensor for determining whether a second power signal is present at the second input.  For example, the AP-505H can sense whether a power signal is present at the first input, *i.e.,* input port E0, and whether a power signal is present at the second input, *i.e.,* DC power input, to determine which power source to use.

**Power**

Ethernet port E0 supports PoE-in (AP is a PoE-PD device), allowing the device to draw power from compliant PoE power sources. If PoE is not available, the access point has a single 48V DC power input to support the AC-to-DC power adapter kit (sold separately). When both PoE and DC power sources are available, the DC power source takes precedence. Enabling IPM will remove all restrictions initially. It then applies configurable restrictions when needed, indicated by the amber LED.

*Id.* at 8.

60.     The AP-505H also includes a controller, operably connected to the first and second sensors, that when it determines that a first power signal is present at the first input and a second power signal is not present at the second input, electrically connects the first input to the first output, and when it determines that a first power signal is not present at the first input and a second power signal is present at the second input, electrically connects the second input to the first output. For example, when PoE is not available through port E0, and the DC input is present, power from the DC input can be used to provide PoE power to port E1:

**Power**

Ethernet port E0 supports PoE-in (AP is a PoE-PD device), allowing the device to draw power from compliant PoE power sources. If PoE is not available, the access point has a single 48V DC power input to support the AC-to-DC power adapter kit (sold separately). When both PoE and DC power sources are available, the DC power source takes precedence. Enabling IPM will remove all restrictions initially. It then applies configurable restrictions when needed, indicated by the amber LED.

*Id*.

Similarly, when DC power is not available, the PoE input can be used to provide PoE power to port E1:

**Table 3** Power Restrictions

| Power | Restrictions |
|---|---|
| DC Power | No restrictions (green) |
| 802.3bt PoE power | No restrictions (green) |
| 802.3at PoE power | USB port disabled when POE-PSE enabled. PSE limited to 802.3af on E1 only (green) |
| 802.3af PoE power | USB and POE-PSE disabled, E3 and E4 disabled (amber) |

*Id.*

61.     On information and belief, each of the '619 Accused Products has been available for purchase in the United States, including but not limited to, directly from HPE, through HPE's website, and/or through HPE-authorized Americas distributors. By way of example only, HPE's

29

AP-505H access point is available for purchase in the United States, including but not limited to through HPE's website:



*See* https://buy.hpe.com/us/en/networking/wireless-devices/wlan-access-points/hpe-aruba-networking-ap%E2%80%91505h-us-dual-radio-802-11ax-2x2-14-ethernet-pse-usb-hospitality-ap/p/r3v48a.

62.    HPE's infringement of the '619 Patent is and has been knowing, deliberate, and willful, since at least May 6, 2026, and not later than the filing date of this Complaint.

63.    Since at least May 6, 2026, and not later than the filing date of this Complaint, HPE, knowing the '619 Accused Products infringe the '619 Patent and with specific intent for others to infringe the '619 Patent, has induced infringement of, and continues to induce infringement of, one or more claims of the '619 Patent under 35 U.S.C. § 271(b), either literally and/or under the doctrine of equivalents, at least by actively inducing others, including its distributors, customers, end-users, and/or other third parties, to make, use, sell, offer to sell, and/or import in or into the United States without authorization the '619 Accused Products and/or products containing or incorporating the '619 Accused Products. HPE knowingly and intentionally instructs its

30

distributors, customers, end-users, and/or other third parties to infringe at least through user manuals, product documentation, and other materials, including without limitation those located on HPE's website. HPE knowingly and intentionally encourages, instructs, causes, and facilitates infringement through the use, importation, sale, offer for sale, deployment, configuration, support, and operation of the '619 Accused Products and/or products containing or incorporating the '619 Accused Products by its distributors, customers, end users, service providers, installers, contractors, partners, consultants, and/or other third parties, and through end users' use of the '619 Accused Products and/or products containing or incorporating the '619 Accused Products in the United States. HPE knows, and has known since at least May 6, 2026, that the '619 Accused Products, and products containing or incorporating the '619 Accused Products, infringe the '619 Patent, and purposefully and knowingly sells and offers to sell the '619 Accused Products to its distributors and customers with the knowledge and expectation that the '619 Accused Products and/or products containing the same will enter the United States market, where they will be imported, used, sold, and offered for sale by its distributors, customers, and/or end-users.

64. Since at least May 6, 2026, and not later than the filing date of this Complaint, HPE further induced infringement by encouraging its customers, downstream distributors, and other end-users of the '619 Accused Products and/or products containing or incorporating the '619 Accused Products in the United States by marketing the '619 Accused Products in the United States; providing information such as detailed installation guides supporting use of the '619 Accused Products that promote their features, specifications, and applications; and providing technical documentation for the '619 Accused Products including user guides, and reference manuals describing how to implement, optimize, and test applications; and by providing commercial and customer support services.

65. To the extent any asserted claim of the '619 Patent requires performance of one or more method steps, and to the extent any such step is performed by HPE's customers, end users, partners, distributors, consultants, service providers, installers, contractors, or other third parties, such performance is attributable to HPE. HPE controls or directs the configuration, deployment, operation, validation, support, and troubleshooting of the '619 Accused Products through HPE firmware and software, power-management logic, PoE and external power configuration requirements, product documentation, installation guides, technical-support materials, training materials, professional-services deployments, certification and validation activities, and customer-support practices. HPE conditions customers' and end users' receipt of the benefits of the accused power-source selection and power-output functionality on installing, configuring, powering, connecting, and operating the '619 Accused Products in the manner specified by HPE, including the manner and timing of detecting PoE input power, detecting external input power, selecting an active power source, and supplying power and data to connected devices. HPE receives a benefit from such use, including revenue from sales, licenses, support, services, maintenance, warranties, and continued customer adoption of the '619 Accused Products. Accordingly, to the extent method claims of the '619 Patent are asserted, all steps of those asserted method claims are performed by HPE or are attributable to HPE under HPE's direction or control.

66. PulseLink has sustained and is entitled to recover damages as a result of HPE's past and continuing infringement, in an amount adequate to compensate for HPE's infringement, but in no event less than a reasonable royalty for the use made of the invention, together with interest and costs as fixed by the Court.

67. HPE's infringement of the '619 Patent is and has been knowing, deliberate, and willful, since at least May 6, 2026, and not later than the filing date of this Complaint. Despite

HPE's knowledge of the '619 Patent, HPE continued and continues to commit acts of direct and indirect infringement despite knowing its actions constitute infringement of the valid and enforceable '619 Patent, despite a risk of infringement that was known or so obvious that it should have been known to HPE, and/or even though HPE otherwise knew or should have known that its actions constituted an unjustifiably high risk of infringement of that valid and enforceable patent.

68.     Under these circumstances, HPE's conduct is and has been egregious. HPE's knowing, deliberate, and willful infringement of the '619 Patent entitles PulseLink to increased damages under 35 U.S.C. § 284, and attorneys' fees and costs from prosecuting this action under 35 U.S.C. § 285.

**COUNT III: INFRINGEMENT OF U.S. PATENT NO. 7,941,677**

69.     PulseLink reasserts and incorporates herein by reference the allegations of all preceding paragraphs of this Complaint as if fully set forth herein.

70.     The '677 Patent contains 6 independent claims and 38 total claims.  Claim 16 reads:

16. A network apparatus, comprising:

a power detection device configured to sense a first power signal from an independent power supply and to sense a second power signal through a network connection,

wherein the network connection supports both data exchange with, and power supply to, the network apparatus; and

a process controller configured to determine an active power source based on either the first power signal or the second power signal, and to control an operation of an auxiliary device operatively connected to the network apparatus based upon the active power source,

wherein the network apparatus is a Voice over Internet Protocol (VoIP) telephone, a camera, a wireless access point, and/or a remote telemetry data collection device.

71.     Claim 16 is directed to a specific network apparatus that manages multiple physical power sources, such as a wireless access point, including a power source that both exchanges data

33

and receives power through a network connection, and also controls an operatively connected auxiliary device based on the detected power sources.

72.     The '677 Patent invention addresses a concrete technological problem in network hardware. For example, the specification explains that the invention concerns "networked devices with variable power consumption and/or multiple power supplies," and expressly contemplates powered network devices that can receive power over a network connection, including "a wireless access point." Exhibit 3, '677 Patent, 1:8-17, 3:8-39. The specification further explains that auxiliary devices may draw power through the network device from the same underlying power source that powers the network device itself, and that power-management failures can create overload conditions, overheating, voltage drops, software errors, and device resets. *Id.* at 1:35-48, 13:36-14:3.

73.     For example, claim 16 describes a concrete technical solution to this specific problem in power distribution and reliability for PoE-powered network devices, including wireless access points. In particular, claim 16 requires a "network apparatus" that includes "a power detection device configured to sense a first power signal from an independent power supply and to sense a second power signal through a network connection," where that same network connection "supports both data exchange with, and power supply to, the network apparatus," and a "process controller" configured to "determine an active power source" from those sensed physical inputs and to "control an operation of an auxiliary device operatively connected to the network apparatus based upon the active power source." *Id.* at claim 16.

74.     The '677 Patent's teachings also confirm that the claims, including claim 16, recite more than merely a desired result. For example, the '677 Patent discloses that the controller may enable or disable the USB port based on actual real-time power usage measurements. *Id.* at 16:13-

34

29. Thus, the invention is tied to a particular device designed to handle real-world power constraints in PoE-capable network devices such as wireless access points.

75.    The '677 Patent's claims are directed to a specific improvement in the operation of network apparatuses that can receive power from both an independent supply and a power-carrying network connection while supporting auxiliary powered devices. For example, claim 16 recites a particular arrangement—a power detection device sensing first and second power signals from distinct physical sources, and a process controller determining the active source and controlling auxiliary-device operation based on that source. *Id.* at claim 16.  The specification describes how that arrangement improves reliability, avoids overload conditions, and manages source-dependent peripheral operation in PoE-based devices. *Id.* at 3:8-39, 3:57-4:38, 15:14-45.

76.    The specification also describes the invention's technological advantages in concrete terms, for example, preventing the PoE source from being overburdened, preventing malfunction, increasing device and/or network-system reliability, and allowing the user to select power from multiple sources to improve reliability and ease PoE power consumption. *Id.* at 4:7-38.

77.    HPE has directly infringed, and continues to directly infringe, one or more claims of the '677 Patent under 35 U.S.C. § 271(a), either literally or under the doctrine of equivalents, at least by making, using, selling, offering to sell, and/or importing in or into the United States without authorization products covered by one or more claims of the '677 Patent, including, but not limited to:

- Wireless access points having a PoE-in port and an external power adapter input, and power-source-dependent feature operation, including but not limited to AP-11D; AP-22D; AP-205H; AP-303; AP-303H; AP-303P; AP-304; AP-305; IAP-

304; IAP-305; AP-314; AP-315; IAP-314; IAP-315; AP-334; AP-335; IAP-334; IAP-335; AP-344; AP-345; AP-504; AP-505; AP-505S; AP-505H; AP-514; AP-515; AP-515S; AP-534; AP-535; AP-555; AP-605H; AP-605R; AP-615; AP-634; AP-634A; AP-635; AP-635A; AP-654; AP-655; AP-723H; AP-725H; AP-734; AP-734A; AP-735; AP-735A; AP-754; and AP-755; and

- other similarly functioning HPE devices (collectively, the "'677 Accused Products").

78. By way of non-limiting example only, HPE's AP-505H access point infringes claim 16 of the '677 Patent as follows.

79. HPE's AP-505H access point is a network apparatus that includes an 802.11ax radio, one uplink port and four Ethernet ports.

80. The AP-505H includes a power detection device configured to sense a first power signal from an independent power supply (*e.g.*, 48V DC power source) and to sense a second power signal through a network connection (*e.g.*, Ethernet port E0 supporting PoE-in). For example, the AP-505H can sense when both DC and PoE power (through port E0) sources are available, and provide precedence to the DC power source.

**Power**

Ethernet port E0 supports PoE-in (AP is a PoE-PD device), allowing the device to draw power from compliant PoE power sources. If PoE is not available, the access point has a single 48V DC power input to support the AC-to-DC power adapter kit (sold separately). When both PoE and DC power sources are available, the DC power source takes precedence. Enabling IPM will remove all restrictions initially. It then applies configurable restrictions when needed, indicated by the amber LED.

*See* HPE Aruba Networking AP-505H Access Points Installation Guide at 8 (available at https://arubanetworking.hpe.com/techdocs/hardware/aps/ap505h/ig/AP-505H_Install_Guide.pdf).

### Electrical

- Ethernet:
  - E0: 100/1000/2500 Base-T auto-sensing Ethernet RJ45 interface
  - IEEE 802.3u (100 Base-T). IEEE 802.3ab (1000 Base-T), IEEE 802.3bz (2500 Base-T)
  - Power over Ethernet IEEE 802.3bt, 802.3at, or 802.3af
- Power:
  - 48V DC power interface, support powering through AC-to-DC power adapter
  - Maximum power consumption (excluding USB): Refer to datasheet

*Id.* at 10.

81.     The AP-505H can also sense the type of PoE power from input port E0.  This indicates that the Accused Product employs at least one sensor or detection circuitry associated with the PoE uplink input at E0.

**Table 3** Power Restrictions

| Power | Restrictions |
|-------|-------------|
| DC Power | No restrictions (green) |
| 802.3bt PoE power | No restrictions (green) |
| 802.3at PoE power | USB port disabled when POE-PSE enabled. PSE limited to 802.3af on E1 only (green) |
| 802.3af PoE power | USB and POE-PSE disabled, E3 and E4 disabled (amber) |

*Id.* at 8.

82.     The network connection (*e.g.,* Ethernet port E0 supporting PoE-in) supports both data exchange with, and power supply to, the network apparatus.

### Ethernet Ports

The AP-505H access points are equipped with one active Ethernet port E0, shown in Figure 2. The port is 100/1000/2500 Base-T, auto-sensing MDI/MDX, which supports uplink connectivity when linked by an Ethernet cable. Refer to Figure 5 for a detailed port pin-out. The AP-505H access points support downlink network connectivity through E1-E4 Ethernet ports. The ports are 10/100/1000Base-T auto-sensing MDI/MDX. Ports E1 and E2 have power sourcing capability (PSE) to supply power to any compliant 802.3af (class 0-3) or 802.3at (class 4) PD device.

*Id.* at 6.

### Power

Ethernet port E0 supports PoE-in (AP is a PoE-PD device), allowing the device to draw power from compliant PoE power sources. If PoE is not available, the access point has a single 48V DC power input to support the AC-to-DC power adapter kit (sold separately). When both PoE and DC power sources are available, the DC power source takes precedence. Enabling IPM will remove all restrictions initially. It then applies configurable restrictions when needed, indicated by the amber LED.

*Id.* at 8.

83.     The AP-505H has a process controller configured to determine an active power source based on either the first power signal or the second power signal, and to control operation of an auxiliary device operatively connected to the network apparatus based upon the active power source. For example, the AP-505H can determine the type of PoE power source from input port E0 when PoE is the active power source, and control the operation of (1) an auxiliary device connected through the USB port by disabling the USB port when the device receives 802.3at or 802.3af PoE power through port E0; or (2) an auxiliary device connected to port E1 by restricting PSE power to 802.3af.

**Power**

Ethernet port E0 supports PoE-in (AP is a PoE-PD device), allowing the device to draw power from compliant PoE power sources. If PoE is not available, the access point has a single 48V DC power input to support the AC-to-DC power adapter kit (sold separately). When both PoE and DC power sources are available, the DC power source takes precedence. Enabling IPM will remove all restrictions initially. It then applies configurable restrictions when needed, indicated by the amber LED.

**Table 3** Power Restrictions

| Power | Restrictions |
|---|---|
| DC Power | No restrictions (green) |
| 802.3bt PoE power | No restrictions (green) |
| 802.3at PoE power | USB port disabled when POE-PSE enabled. PSE limited to 802.3af on E1 only (green) |
| 802.3af PoE power | USB and POE-PSE disabled, E3 and E4 disabled (amber) |

*Id.* at 8.

84.     The AP-505H is a wireless access point.

The HPE Aruba Networking AP-505H Access Points support the full 802.11ax (Wi-FI 6) featureset with dual 2x2 MIMO radios, deliver locationing functions, and can serve as a flexible IOT gateway, delivered through the built-in BLE and 802.15.4 radio.

*Id.* at 3.

85.     On information and belief, each of the '677 Accused Products has been available for purchase in the United States, including but not limited to, directly from HPE, through HPE's website, and/or through HPE-authorized Americas distributors. By way of example only, HPE's

AP-505H access point is available for purchase in the United States, including but not limited to through HPE's website:



*See* https://buy.hpe.com/us/en/networking/wireless-devices/wlan-access-points/hpe-aruba-networking-ap%E2%80%91505h-us-dual-radio-802-11ax-2x2-14-ethernet-pse-usb-hospitality-ap/p/r3v48a.

86.    HPE's infringement of the '677 Patent is and has been knowing, deliberate, and willful, at least as of June 30, 2011.

- HP Development Company LP ("HPDC"), HPE's predecessor company prior to HPDC's split into HPE and HP Inc. in 2015, knew of the publication of the application leading to the '677 Patent when it included U.S. Patent Publication No. 2008/0168283 in a June 30, 2011 list of references during prosecution of HPDC's U.S. Patent No. 8,533,500;

- HPDC knew of the publication of the application leading to the '677 Patent through an examiner's citation of the U.S. Patent Publication No. 2008/0168283 in an

August 30, 2011 list of references during prosecution of HPDC's U.S. Patent No. 8,214,680;

- HPDC knew of the publication of the application leading to the '677 Patent through an examiner's citation of U.S. Patent Publication No. 2008/0168283 in an October 5, 2015 list of references during prosecution of HPDC's U.S. Patent Application No. 13/851,345;

- HPE knew of the publication of the application leading to the '677 Patent when U.S. Patent Publication No. 2008/0168283 was included (1) as a "document of particular relevance" in a February 23, 2017 International Search Report and (2) as the primary prior art reference cited in a March 1, 2018 International Preliminary Report on Patentability, during prosecution of HPE's PCT application No. PCT/US2015/045280; and

- HPE knew of the publication of the application leading to the '677 Patent when it included U.S. Patent Publication No. 2008/0168283 in a January 8, 2024 Information Disclosure Statement during prosecution of HPE's U.S. Patent Application No. 18/531,268.

87.     Since at least June 30, 2011, HPE, knowing the '677 Accused Products infringe the '677 Patent and with specific intent for others to infringe the '677 Patent, has induced infringement of, and continues to induce infringement of, one or more claims of the '677 Patent under 35 U.S.C. § 271(b), either literally and/or under the doctrine of equivalents, at least by actively inducing others, including its distributors, customers, end-users, and/or other third parties, to make, use, sell, offer to sell, and/or import in or into the United States without authorization the '677 Accused Products and/or products containing or incorporating the '677  Accused Products. HPE knowingly

40

and intentionally instructs its distributors, customers, end-users, and/or other third parties to infringe at least through user manuals, product documentation, and other materials, including without limitation those located on HPE's website. HPE knowingly and intentionally encourages, instructs, causes, and facilitates infringement through the use, importation, sale, offer for sale, deployment, configuration, support, and operation of the '677 Accused Products and/or products containing or incorporating the '677 Accused Products by its distributors, customers, end users, service providers, installers, contractors, partners, consultants, and/or other third parties, and through end users' use of the '677 Accused Products and/or products containing or incorporating the '677 Accused Products in the United States. HPE knows, and has known since June 30, 2011, that the '677 Accused Products, and products containing or incorporating the '677 Accused Products, infringe the '677 Patent, and purposefully and knowingly sells and offers to sell the '677 Accused Products to its distributors and customers with the knowledge and expectation that the '677 Accused Products and/or products containing the same will enter the United States market, where they will be imported, used, sold, and offered for sale by its distributors, customers, and/or end-users.

88.     Since at least June 30, 2011, HPE further induced infringement by encouraging its customers, downstream distributors, and other end-users of the '677 Accused Products and/or products containing or incorporating the '677 Accused Products in the United States by marketing the '677 Accused Products in the United States; providing information such as detailed installation guides supporting use of the '677 Accused Products that promote their features, specifications, and applications; and providing technical documentation for the '677 Accused Products including user guides, and reference manuals describing how to implement, optimize, and test applications; and by providing commercial and customer support services.

41

89.     To the extent any asserted claim of the '677 Patent requires performance of one or more method steps, and to the extent any such step is performed by HPE's customers, end users, partners, distributors, consultants, service providers, installers, contractors, or other third parties, such performance is attributable to HPE. HPE controls or directs the configuration, deployment, operation, validation, support, and troubleshooting of the '677 Accused Products through HPE firmware and software, PoE power-management functionality, external power and PoE-input requirements, USB and PSE-output control logic, product documentation, installation guides, technical-support materials, training materials, professional-services deployments, certification and validation activities, and customer-support practices. HPE conditions customers' and end users' receipt of the benefits of the accused power-management and auxiliary-device-control functionality on installing, configuring, powering, connecting, and operating the '677 Accused Products in the manner specified by HPE, including the manner and timing of sensing power from an independent power supply, sensing power through a network connection, determining an active power source, and controlling operation of auxiliary devices based on the active power source. HPE receives a benefit from such use, including revenue from sales, licenses, support, services, maintenance, warranties, and continued customer adoption of the '677 Accused Products. Accordingly, to the extent method claims of the '677 Patent are asserted, all steps of those asserted method claims are performed by HPE or are attributable to HPE under HPE's direction or control.

90.     PulseLink has sustained and is entitled to recover damages as a result of HPE's past and continuing infringement, in an amount adequate to compensate for HPE's infringement, but in no event less than a reasonable royalty for the use made of the invention, together with interest and costs as fixed by the Court.

91.     HPE's infringement of the '677 Patent is and has been knowing, deliberate, and willful, since at least June 30, 2011. Despite HPE's knowledge of the '677 Patent since June 30, 2011, and in any event no later than the filing date of the Complaint, HPE continued and continues to commit acts of direct and indirect infringement despite knowing its actions constitute infringement of the valid and enforceable '677 Patent, despite a risk of infringement that was known or so obvious that it should have been known to HPE, and/or even though HPE otherwise knew or should have known that its actions constituted an unjustifiably high risk of infringement of that valid and enforceable patent.

92.     Under these circumstances, HPE's conduct is and has been egregious. HPE's knowing, deliberate, and willful infringement of the '677 Patent entitles PulseLink to increased damages under 35 U.S.C. § 284, and attorneys' fees and costs from prosecuting this action under 35 U.S.C. § 285.

## COUNT IV: INFRINGEMENT OF U.S. PATENT NO. 8,289,845

93.     PulseLink reasserts and incorporates herein by reference the allegations of all preceding paragraphs of this Complaint as if fully set forth herein.

94.     The '845 Patent contains 2 independent claims and 26 total claims.  Claim 1 reads:

1. A method, comprising:

a processor selecting at least two parameters, the at least two parameters including a measurement rate and a timeout parameter;

the processor selecting two or more performance metric thresholds;

the processor conducting a communication session including at least one data signal and at least one control signal over a first bidirectional communication path;

the processor monitoring at least the first bidirectional communication path and a second bidirectional communication path, wherein the monitoring comprises sending at least one first test packet over the first bidirectional communication path to a first enterprise site and at least one second test packet over the second bidirectional communication path

to the first enterprise site, wherein the first test packet and second test packet are not associated with the communication session;

receiving the first test packet over the first bidirectional communication path from the first enterprise site, wherein the first enterprise site returns the first test packet to the processor over the first bidirectional communication path;

receiving the second packet over the second bidirectional communication path from the first enterprise site, wherein the first enterprise site returns the second test packet to the processor over the second bidirectional communication path;

the processor calculating the value of the at least two parameters upon the return of each of the first test packet on the first bidirectional communication path and the second test packet on the second bidirectional communication path;

the processor comparing the at least two parameters to the two or more performance metric thresholds for each of the first bidirectional communication path and the second bidirectional communication path;

the processor, based on the comparison, determining that at least one parameter of the at least two parameters meets or exceeds at least one of the two or more performance metric thresholds in response to the determination, determining that performance over the first bidirectional communication path is degraded; and

the processor, based on the degraded performance determination, moving, in real-time, at least one of the data signals and the control signals associated with the communication session from the first bidirectional communication path to the second bidirectional communication path.

95.     The '845 Patent is directed to technical improvements in packet-switched communication path selection. For example, claim 1 recites a method in which a processor selects measurement parameters and performance thresholds, conducts a communication session over a first bidirectional communication path, monitors both first and second bidirectional communication paths using non-session test packets, calculates monitored parameter values upon return of those packets, compares those values to thresholds, determines degraded performance, and moves session data and/or control signals in real time to the second bidirectional communication path.

96.     The claimed invention addresses specific network problems that existed in prior art systems. For example, the '845 Patent explains that Border Gateway Protocol ("BGP") "was designed to provide connectivity" but "does not take actual performance into account," leaving enterprise customers without end-to-end performance guarantees for mission-critical applications. *See* Exhibit 4, '845 Patent, 2:4-20. The '845 Patent further explains that performance degradation can render an application unusable even though connectivity remains available, a "brownout" problem that BGP cannot address because BGP reacts only to total loss of connectivity. *See id.* at 2:21-55.

97.     The '845 Patent also identifies shortcomings in prior path-optimization technology. For example, existing systems were not usually configured with the measurement rates and timeout-related parameters needed to detect degradation quickly enough to prevent active users from perceiving it and could not control the return path of measurements selected by default routing protocols such as BGP. *See id.* at 3:5-17; 4:5-26.

98.     The '845 Patent's claimed solution, including claim 1, is technical and network-specific. It uses measurement-rate and timeout parameters, non-session test packets, bidirectional monitoring of first and second communication paths, return of the test packets over the same bidirectional paths, threshold-based degradation detection, and real-time movement of session data/control signals to a better path. *See id.* at claim 1.

99.     The claimed method also improves network operation. For example, as the '845 Patent explains, bidirectional path optimization permits control of the return path, supports detection and repair of unidirectional failures, and ensures measurements travel symmetrically so that they mirror actual data and/or control signaling traffic. *See id.* at 4:18-44. The '845 Patent also explains that the invention redirects application traffic in real time via the better-performing path

while avoiding unnecessary propagation of performance routes outside the edge network. *See id.* at 5:17-29.

100. The claimed combination was not well-understood, routine, or conventional as of the priority date. For example, the prior technology lacked the claimed combination of application-sensitive measurement parameters, timeout-based degradation detection, controlled bidirectional return-path measurements, and real-time movement of active session data/control signals between bidirectional communication paths. *See id.* at 3:5-17; 4:5-44; 19:61-20:43. Accordingly, the patented invention contains specific technical limitations that improve packet-switched network performance and real-time session continuity.

101. HPE has directly infringed, and continues to directly infringe, one or more claims of the '845 Patent under 35 U.S.C. § 271(a), either literally or under the doctrine of equivalents, at least by making, using, selling, offering to sell, and/or importing in or into the United States without authorization products covered by one or more claims of the '845 Patent, including, but not limited to:

- HPE Aruba Networking EdgeConnect SD-WAN physical appliances, including but not limited to the EC-10104, EC-10106, EC-10108, EC-S-P, EC-M-H, and EC-10150;

- HPE Aruba Networking EdgeConnect virtual appliances ("EC-V") deployed in hypervisor-hosted and cloud-hosted environments;

- HPE Aruba Networking SD-WAN Orchestrator software and associated EdgeConnect SD-WAN software used to configure, manage, monitor, and operate EdgeConnect SD-WAN appliances; and

- other similarly functioning HPE Aruba Networking EdgeConnect SD-WAN gateways, appliances, software, and configurations (collectively, the "'845 Accused Products").

102. By way of non-limiting example only, HPE's use of an HPE Aruba Networking EdgeConnect SD-WAN appliance, including an EC-M-H appliance running EdgeConnect software and configured through HPE Aruba Networking SD-WAN Orchestrator, infringes claim 1 of the '845 Patent as follows. HPE's use includes, but is not limited to, use of the '845 Accused Products in its own facilities, testing (*e.g.*, internal QA/regression testing, manufacture acceptance testing, trial runs by engineers, etc.), product validation, product improvement, customer and sales demos, training labs, professional services deployments, customer support and troubleshooting, and certification and validation.

103. HPE Aruba Networking EdgeConnect SD-WAN physical and virtual appliances are deployed in branch offices and data centers to create a secure virtual WAN overlay. EdgeConnect SD-WAN enables enterprises to create multiple application-specific WAN overlays, where each Business Intent Overlay ("BIO") specifies priority and quality-of-service requirements for application groups based on business requirements or intent.

104. EdgeConnect automates traffic steering on an end-to-end basis across underlying WAN transport services, including MPLS, broadband Internet, and 4G/LTE. Each BIO has its own link-bonding policy specifying the underlay transports the BIO will use, the service level including path conditioning, and topology.

105. The '845 Accused Products include processors that can be used to select at least two parameters including a measurement rate parameter (*e.g.*, loss/percentage loss, Pre-FEC Loss %, Post-FEC Loss %, inferred loss, Ping QoE/per-minute average Ping QoE, and/or adaptive FEC

47

ratio) and a timeout parameter (*e.g.*, loss/percentage loss, Pre-FEC Loss %, Post-FEC Loss %, inferred loss, Ping QoE/per-minute average Ping QoE, average latency/RTT, RTTavg, Packet Reorder Wait Time/Reorder wait, and/or FastFail Wait Time/Twait).



*See* https://arubanetworking.hpe.com/techdocs/sdwan/docs/orch/monitoring/bandwidth/overlay-int-transport/.



*See* https://arubanetworking.hpe.com/techdocs/sdwan/docs/orch/configuration/overlays/bios/.



*See* https://arubanetworking.hpe.com/techdocs/sdwan/docs/orch/monitoring/tunnel-health/loss-summary/.

| Application Performance trend | The trend of how the traffic flow for this application has performed over time. |
| --- | --- |
| Status | Indicates if the traffic flow for this application on this appliance is meeting the optimal targets set for this application. Possible statuses:<br><br>Initial – AppExpress is in provisioning and will soon enter the Learning state.<br><br>Learning – AppExpress is in startup and needs time to accumulate Ping QoE scores.<br><br>Ping Optimal – No User flows have been observed; however, AppExpress has found at least one Ping path that meets the Target QoE. When a user flow is observed, AppExpress will route the flow to the path shown in the Current Transports column.<br><br>Ping Suboptimal – No User flows have been observed and there are no paths whose Ping QoE meets the Target QoE. User flows will be routed to the path with the highest Ping QoE.<br><br>User Optimal – User flows have been observed and are meeting the Target QoE. New user flows will be routed to the path shown in the Current Transports column until the User QoE no longer meets the Target QoE.<br><br>User Suboptimal – User flows have been observed; however, they are not meeting the Target QoE over the Current Transports. At the next User QoE interval, AppExpress will try the next best transport path sorted by Ping QoE score.<br><br>Fallback – No user flows have been observed and pings to all paths are failing. AppExpress will revert to standard BIO handling for new flows. |
| Ping QoE | An Apdex score that is based on synthetic polling. Failed connections count toward the F boundary. Synthetic polling consists of pings that go out from an EdgeConnect appliance through the loopback interface for the appliance across each path. From these pings, the system determines the Ping QoE for each flow.<br><br>To view trends for Ping QoE, click the chart icon in this column to open the Ping QoE Trends chart. For information about the data shown on the chart, see Ping QoE Trends. |

*See*
https://arubanetworking.hpe.com/techdocs/sdwan/docs/orch/monitoring/performance/appexpress-summary/.

## Ping QoE Trends

To view Ping QoE Trends for all paths that are available on an appliance for a selected application, click the chart icon in the Ping QoE column for an appliance to open the Ping QoE Trends chart. This chart displays the trends associated with one application and one appliance only.

- AppExpress must be enabled for the application for data to appear in the chart.

- The vertical axis of the chart is labeled using the EdgeConnect QoE ratings. These are fixed values of Excellent: 100-93, Good: 92-84, Fair: 83-64, and Best-Effort (<68).

- Displays the per-minute average of Ping QoE for all possible paths on an appliance.

- The trends for each path are displayed as a separate chart within the window.

- If the Ping QoE falls below the Target QoE for a path, the chart is highlighted in yellow.

*See*
https://arubanetworking.hpe.com/techdocs/sdwan/docs/orch/monitoring/performance/appexpress-summary/.



*See* https://arubanetworking.hpe.com/techdocs/sdwan/docs/orch/orchestrator/server/tunnel-settings/.



*See* https://arubanetworking.hpe.com/techdocs/sdwan/docs/orch/configuration/overlays/bios/.

51

52

| Link Reorder Frequency | **Aggressive** – Changes in underlay performance are detected within a few seconds. This setting is best for high-speed networks, such as dual high-speed internet links.<br><br>**Moderate** – Changes in underlay performance are detected within about a minute.<br><br>**Conservative** – Changes in underlay performance take several minutes to detect. This is useful for situations where you want to be certain that the primary link is not performing as expected before switching to another link. |
|---|---|
| Path Conditioning | Measured as a percentage. This controls the amount of FEC employed for the overlay. More FEC means more overhead but a higher chance to recover lost or delayed packets.<br><br>**NOTE:** For HQ and HA modes that use Waterfall, when two or more links are present FEC is transmitted on the second-best link. FEC is spread over all eligible underlays for HT and HE modes that use Balanced link selection. |
| Packet Reorder Wait Time | Measured in milliseconds (ms). This determines how long to wait for packet order correction (POC) to occur. When the wait time expires, all missed packets are declared as lost packets. If the EdgeConnect sees packets not arriving or arriving out of order, it dynamically increases this timer. |
| Link Selection | **Waterfall** – Cascades packets across eligible underlays based on one of five quality measures. Select one of the quality measures from the drop-down menu: **Overall Quality**, **Latency**, **Loss**, **Jitter**, or **Link Order**. Waterfall is used for both High Availability and High Quality overlay modes.<br><br>**Balanced** – Per-packet load balancing across all eligible underlays based on one of three modes. Select one of the modes from the drop-down menu:<br>**Link Capacity (Local)** – Fills the "most open" link first. The EdgeConnect fills whichever link has the most bandwidth available until all links have the same amount of absolute available bandwidth. This balancing mode is used by the High Throughput overlay mode.<br>**Link Utilization (Local)** – Fills links proportionally to total link capacity.<br>**Link Utilization (Local & Remote)** – Fills links based on tunnel capacity. This balancing mode is used by the High Efficiency overlay mode.<br><br>For Link Utilization mode, the EdgeConnect tries to keep all links at the same percent (%) utilization. For example, if one link is at 50% utilization, the EdgeConnect fills the other links until all links are at 50% utilization. |

*See* https://arubanetworking.hpe.com/techdocs/sdwan/docs/orch/configuration/overlays/bios/.

52



| Field | Description |
|---|---|
| Fastfail enabled | When multiple tunnels are carrying data between two appliances, this feature determines how quickly to disqualify a tunnel from carrying data.<br><br>The Fastfail connectivity detection algorithm for the wait time from receipt of last packet before declaring a **brownout** is:<br><br>`Twait = Base + N * RTTavg`<br><br>where `Base` is a value in milliseconds, and `N` is the multiplier of the average Round Trip Time over the past minute.<br><br>For example, if:<br><br>`Base = 200mS`<br>`N = 2`<br><br>then,<br><br>`RTTavg = 50mS`<br><br>The appliance declares a tunnel to be in brownout if it does not see a reply packet from the remote end within 300 mS of receiving the most recent packet.<br><br>In the Tunnel Advanced Options, `Base` is expressed as **Fastfail wait-time base offset** (ms), and `N` is expressed as **Fastfail RTT multiplication factor**.<br><br>**Fastfail enabled** - This option is triggered when a tunnel's keep-alive signal does not receive a reply. The options are **disable**, **enable**, and **continuous**. If the disqualified tunnel subsequently receives a keep-alive reply, its recovery is instantaneous.<br><br>For disable, keep-alives are sent every second, and 30 seconds elapse before failover. In that time, all transmitted data is lost.<br><br>For enable, keep-alives are sent every second, and a missed reply increases the rate at which keep-alives are sent from one per second to ten per second. Failover occurs after one second.<br><br>For continuous, keep-alives are continuously sent at ten per second. Therefore, failover occurs after one tenth of a second. |

*See* https://arubanetworking.hpe.com/techdocs/sdwan/docs/orch/orchestrator/server/tunnel-settings/.

106.    The '845 Accused Products include processors that can be used to select two or more performance metric thresholds corresponding to the selected path-quality parameters (*e.g.*, loss/percentage-loss thresholds, latency/average-latency thresholds, and/or jitter thresholds) for monitored paths and tunnels.

Service Level Objective (SLO)

Traffic is routed through the primary interfaces exclusively until the Service Level Objectives (SLOs) for Loss, Latency, or Jitter have been exceeded. If this occurs, backup interfaces are added to the overlay to help meet the specified SLO.

You should configure SLOs based on the tolerance of the application to network performance. You should not configure SLOs based on the type of network or expected performance of the network itself. SLOs are about the application, not the network. For example, for voice SLOs most customers find 250ms Latency, 50ms Jitter, and 10% Loss to be acceptable parameters.

For High Availability and High Quality "waterfall" overlay modes, when an underlay violates the Loss SLO, the underlay is not removed from the overlay until the overlay itself violates the SLO. For High Throughput and and High Efficiency "balanced" modes, when an underlay violates the Loss SLO, it is immediately removed from the overlay. The Exclude Links BIO setting controls this behavior and can be modified using the Custom link bonding policy.

The Exclude Links setting does not apply to Latency or Jitter SLOs. Those SLOs always operate with Exclude Links set to "on Underlay Brownout".

*See* https://arubanetworking.hpe.com/techdocs/sdwan/docs/orch/configuration/overlays/bios/.

Break Out Locally Using These Interfaces, Available Interfaces, and Link Selection

- You can select the best internet breakout links by specifying the type of Link Selection; either **Waterfall** or **Balanced**.
  - If **Waterfall** is selected, links are ranked on the selected threshold, from best to worst, using an inference system that averages performance of all SDWAN fabric tunnels associated with a given label. In Waterfall mode, flows are routed across the best label until bandwidth utilization is above 80%. Once 80% utilization is reached flows will "waterfall" to the next-best label. For more information about Waterfall mode, see Internet Breakout Trends.
  - If **Balanced** is selected, flows are subjected to a weighted load-balancing algorithm. The weighting is proportional to the available bandwidth of the link.
  - For both **Waterfall** and **Balanced**, if a threshold is configured for **Loss**, **Latency**, or **Jitter**, the system removes the link from Local Breakout eligibility when it exceeds the threshold.
- You can choose to set IP SLA Rule destinations.
- If you select the **Threshold-based Failover** check box, the Preferred Policy Order is applied when all links violate the configured threshold. This setting is useful when you want the system to backhaul traffic during Local Breakout threshold violation. When this check box is cleared, all Local Breakout labels must be down for flows to fall to the next policy.
- For Local Breakout flows, the system uses session affinity to attempt to keep flows with the same source and destination IPs on the same link. You can change the session affinity timeout.

*See id.*

107. The '845 Accused Products include processors that can be used to conduct a communication session over a first bidirectional communication path (*e.g.*, a selected EdgeConnect tunnel/path used by the BIO session, such as a selected MPLS underlay tunnel, selected broadband-Internet underlay tunnel, or selected 4G/LTE underlay tunnel) that has a data signal (*e.g.*, application payload traffic, TCP data segments carried over an EdgeConnect

BIO/overlay tunnel) and at least one control signal (*e.g.*, TCP SYN, SYN-ACK, FIN, ACK, RST, TCP keep-alive traffic associated with the same session).

| End to End FIN Handling | This feature helps to fine tune TCP behavior during a connection's graceful shutdown event. When this feature is **ON** (Default), TCP on the local appliance synchronizes this graceful shutdown of the local LAN side with the LAN side of the remote appliance. When this feature is **OFF** (Default TCP), no such synchronization happens and the two LAN segments at the ends gracefully shut down, independently. |
|---|---|
| IP Block Listing | If selected, and if the appliance does not receive a TCP SYN-ACK from the remote end within five seconds, the flow proceeds without acceleration and the destination IP address is blocked for one minute. |
| Keep Alive Timer | Allows changing the Keep Alive timer for the TCP connections. **Probe Interval:** Time interval in seconds between two consecutive Keep Alive probes. **Probe Count:** Maximum number of Keep Alive probes to send. **First Timeout (Idle):** Time interval until the first Keep Alive timeout. |
| LAN Side Window Scale Factor Clamp | This setting allows the appliance to present an artificially lowered Window Scale Factor (WSF) to the end host. This reduces the need for memory in scenarios in which there are many out-of-order packets being received from the LAN side. These out-of-order packets cause much buffer utilization and maintenance. |
| Per-Flow Buffer | (**Max LAN to WAN Buffer** and **Max WAN to LAN Buffer**) This setting clamps the maximum buffer space that can be allocated to a flow, in each direction. |
| Persist timer Timeout | Allows the TCP to terminate connections that are in Persist timeout stage after the configured number of seconds. |
| Preserve Packet Boundaries | Preserves the packet boundaries end-to-end. If this feature is disabled, the appliances in the path can coalesce consecutive packets of a flow to use bandwidth more efficiently. It is enabled by default so that applications requiring packet boundaries to match do not fail. |
| Route Policy Override | Tries to override asymmetric route policy settings. It emulates auto-opt behavior by using the same tunnel for the returning SYN+ACK as it did for the original SYN packet. Disable this feature if the asymmetric route policy setting is necessary to correctly route packets. In this case, you might need to configure flow redirection to ensure optimization of TCP flows. |
| Slow LAN Defense | Resets all flows that consume a disproportionate amount of buffer and have a very slow throughput on the LAN side. Owing to a few slower end hosts or a lossy LAN, these flows affect the performance of all other flows so that no flows see the customary throughput improvement gained through TCP acceleration. This feature is enabled by default. The number relates indirectly to the amount of time the system waits before resetting such slow flows. |

*See* https://arubanetworking.hpe.com/techdocs/sdwan/docs/orch/configuration/templates/opt-policies/.

55

First-Packet iQ

First Packet iQ provides robust capabilities for Application Visibility and Control (AVC) that simplify establishment of route policies by application or domain. Rapid classification is critical for making traffic forwarding decisions.

When different groups of applications are mapped to Business Intent Overlays, the decision on which overlay to place the flow must be correct on the first packet, or application performance will suffer.

Unique in the industry, First-Packet iQ goes above and beyond traditional Deep Packet Inspection techniques that typically require several packets of HTTP or HTTPS to identify applications accurately. Using First-Packet iQ, EdgeConnect can immediately and efficiently steer flows to the best route and avoid the need for after-the-fact route remediation. With Silver Peak's unique technology to "map the Internet," EdgeConnect can provide the granular Internet breakout policies as shown above.

Business Intent Overlays

The Aruba EdgeConnect SD-WAN platform enables enterprises to create multiple application-specific WAN overlays. Each overlay, or Business Intent Overlay (BIO), specifies priority and quality of service requirements for application groups based on business requirements or intent.

With these policy definitions in place, EdgeConnect automates traffic steering on an end-to-end basis across all underlying WAN transport services including MPLS, broadband Internet and 4G/LTE, providing the ability to deliver an application Quality of Experience significantly better than the underlying transport services can deliver individually. Each BIO has its own link bonding policy that specifies the underlay transports the BIO will use, the service level including path conditioning, and topology (full mesh, hub-and-spoke, or regional hub-and-spoke).

Each BIO has settings that include Traffic Class/QoS, Firewall Zone, and the option to enable WAN Optimization.

*See* https://arubanetworking.hpe.com/techdocs/VSG/docs/070-sd-branch-design/esp-sd-branch-design-040-solution-overview-ec/.

108. The '845 Accused Products include processors that can be used to monitor at least a first bidirectional communication path and a second bidirectional communication path by sending a first test packet over the first bidirectional communication path and a second test packet over the second bidirectional communication path to a first enterprise site. For example, the first and second bidirectional communication paths may be distinct monitored WAN/underlay paths,

56

such as MPLS and Internet underlay tunnels, between the same pair of EdgeConnect appliances at different enterprise sites. The mapped test packets include, for example, Ping/ICMP echo-request probes, appliance-level underlay keep-alive packets, path-characterization /pathchar traffic or packets, and health probes used to monitor the reachability, health, loss, latency, and jitter of specific paths or tunnels. These monitoring/test packets are separate from, and are not associated with, the underlying user communication session itself. This path monitoring supplies the path-specific events from which the selected loss/percentage-loss, latency/RTT, Ping QoE, and related path-quality or timeout-dependent parameters are calculated and evaluated.

The types of transport traffic are:

- Underlay – Includes traffic that traverses directly over SD-WAN underlay tunnels (excluding BIO overlay traffic, which also uses these tunnels). For example, if you create a rule with match criterion *application x*, and then send it over to New_York_MPLS_MPLS (an underlay tunnel), the traffic is categorized as underlay traffic. In addition, underlay traffic includes data sent over actual SD-WAN underlay tunnels, generally including the following types of control messages:

  - Keep alive packets – Appliances use these packets to evaluate the reachability of remote peers and the health of connections.

  - Path characterization (pathchar) – Measures path characteristics (loss, latency, and jitter) for a specific path or tunnel.

*See* https://arubanetworking.hpe.com/techdocs/sdwan/docs/orch/monitoring/bandwidth/overlay-int-transport/.



*See* https://arubanetworking.hpe.com/techdocs/VSG/docs/070-sd-branch-design/esp-sd-branch-design-040-solution-overview-ec/.



*See* https://arubanetworking.hpe.com/techdocs/VSG/docs/070-sd-branch-design/esp-sd-branch-design-060-ec-overlay-design/.



*See* https://arubanetworking.hpe.com/techdocs/sdwan/docs/orch/configuration/policy/ipsla/.



*See* https://arubanetworking.hpe.com/techdocs/sdwan-PDFs/deployments/dg_ECV-Azure_latest.pdf.



*See*
https://arubanetworking.hpe.com/techdocs/sdwan/docs/orch/monitoring/performance/appexpress
-summary/.

109.　The '845 Accused Products include processors that can be used to receive a returned first-path monitoring/test packet over the first bidirectional communication path from the first enterprise site, where a remote EdgeConnect appliance at the first enterprise site returns the first-path monitoring/test packet to the processor over that same first bidirectional communication path. The processor can also be used to receive a returned second-path monitoring/test packet over the second bidirectional communication path from the first enterprise site, where a remote EdgeConnect appliance at the first enterprise site returns the second-path monitoring/test packet to the processor over that same second bidirectional communication path. The returned first-path and second-path monitoring/test packets supply path-specific measurement events used to calculate or evaluate loss/percentage loss, latency/RTT, Ping QoE, and related path-quality or timeout-dependent parameters.

The types of transport traffic are:

- Underlay – Includes traffic that traverses directly over SD-WAN underlay tunnels (excluding BIO overlay traffic, which also uses these tunnels). For example, if you create a rule with match criterion *application x*, and then send it over to New_York_MPLS_MPLS (an underlay tunnel), the traffic is categorized as underlay traffic. In addition, underlay traffic includes data sent over actual SD-WAN underlay tunnels, generally including the following types of control messages:

  - Keep alive packets – Appliances use these packets to evaluate the reachability of remote peers and the health of connections.

  - Path characterization (pathchar) – Measures path characteristics (loss, latency, and jitter) for a specific path or tunnel.

- Services – Includes two types of traffic:

  - Any non-BIO traffic sent to non-SD-WAN locations over an encapsulated tunnel (that is, IPSec or GRE), such as Zscaler.

  - Any encapsulated traffic that matches a BIO match criterion sent to a cloud service.

- Passthrough – Includes any non-BIO traffic sent without any encapsulation to a destination.

- SP Overlay – Includes any traffic sent to SD-WAN peers over BIO-bonded tunnels.

- Breakout (local breakout or to the internet) – Includes any non-encapsulated traffic that matches a BIO match criterion sent to non-SD-WAN peers.

*See* https://arubanetworking.hpe.com/techdocs/sdwan/docs/orch/monitoring/bandwidth/overlay-int-transport/.

## Interface Selection

Primary and backup interfaces are defined in the BIO. Interfaces in the primary interfaces list are frequently probed for health and are all used to transport traffic, based on the bonding policy.

Backup interfaces are used only when all primary circuits are down or do not meet the configured SLAs. Backup interfaces pass only enough traffic to keep the IPsec tunnel running and do not have health probes.

Best practice is to place all commodity Internet and MPLS interfaces on the primary interface list and use the backup list for metered interfaces such as mobile circuits.

*See* https://arubanetworking.hpe.com/techdocs/VSG/docs/070-sd-branch-design/esp-sd-branch-design-060-ec-overlay-design/.

110.    The '845 Accused Products include processors that can be used to calculate the value of at least two parameters (*e.g.*, loss/percentage loss, average latency/RTT, and/or related path-quality or timeout-dependent indicators) upon the return of each of the first test packet on the first bidirectional communication path and the second test packet on the second bidirectional communication path.  For example, Aruba's path-characterization function measures loss, latency,

and jitter for a specific path or tunnel. Aruba's IP SLA and BIO materials further explain that the system calculates percentage loss and average latency and uses those values to determine whether passthrough tunnels are "up" or "down."

The types of transport traffic are:

- Underlay – Includes traffic that traverses directly over SD-WAN underlay tunnels (excluding BIO overlay traffic, which also uses these tunnels). For example, if you create a rule with match criterion *application x*, and then send it over to New_York_MPLS_MPLS (an underlay tunnel), the traffic is categorized as underlay traffic. In addition, underlay traffic includes data sent over actual SD-WAN underlay tunnels, generally including the following types of control messages:

  - Keep alive packets – Appliances use these packets to evaluate the reachability of remote peers and the health of connections.

  - Path characterization (pathchar) – Measures path characteristics (loss, latency, and jitter) for a specific path or tunnel.

*See* https://arubanetworking.hpe.com/techdocs/sdwan/docs/orch/monitoring/bandwidth/overlay-int-transport/.

| | |
|---|---|
| Reachability | The system uses these values to determine if the probe can reach the destinations or not. A good value for these is 5, based on a 1 second Keep Alive Interval. Setting these any lower could cause false positives.<br><br>**Mark Up after X Pings/X Sequential Successes** – Enter a numeric value. The system makes this many attempts to reach the destinations, and it marks the status of the tunnels as "up" after it receives this many successful responses from any of the destinations.<br><br>**Mark Down after X Failed Pings/X Sequential Failures** – Enter a numeric value. The system marks the status of the tunnels as "down" after this many consecutive failed responses from ALL destinations. |
| Loss | The system uses these values as thresholds when calculating percentage loss to determine if the passthrough tunnels are "up" or "down".<br><br>**Mark Up after loss below X%** – Enter a percentage. The system marks the status of the tunnels as "up" if the percentage loss calculated from the best performing destination is below this threshold.<br><br>**Mark down after loss above X%** – Enter a percentage. The system marks the status of the tunnels as "down" if the percentage loss calculated from the best performing destination exceeds this threshold. This means that all destinations in the Address field must have crossed this threshold for the system to invoke the "down" status. |
| Latency | The system uses these values as thresholds when calculating average latency to determine if the passthrough tunnels are "up" or "down". These values are measured in milliseconds.<br><br>**Mark Up after average latency below X** – Enter a numeric value. The system marks the status of the tunnels as "up" if the average latency calculated from the best performing destination is below this threshold.<br><br>**Mark Down after average latency above X** – Enter a numeric value. The system marks the status of the tunnels as "down" if the average latency calculated from the best performing destination exceeds this threshold. This means that all destinations in the Address field must have crossed this threshold for the system to invoke the "down" status. |
| Loss OR Latency, Loss AND Latency | Select one of two options for combining the Loss and Latency metrics.<br><br>**OR** – The system marks the status of the tunnels as "down" if either the Loss or the Latency thresholds are crossed.<br><br>**AND** – The system marks the status of the tunnels as "down" if both the Loss and Latency thresholds are crossed. |

*See* https://arubanetworking.hpe.com/techdocs/sdwan/docs/orch/configuration/overlays/bios/.

111.    The '845 Accused Products include processors that can be used to compare the at least two parameters to two or more performance metric thresholds for each of the first bidirectional communication path and the second bidirectional communication path. For example, Aruba's BIO/IP SLA materials identify Loss and Latency values as thresholds, explain that the system uses those thresholds when calculating percentage loss and average latency to determine whether passthrough tunnels are "up" or "down," and further explain that EdgeConnect checks at the configured IP SLA status interval whether the thresholds have been crossed.



*See* https://arubanetworking.hpe.com/techdocs/sdwan/docs/orch/configuration/overlays/bios/.

## IP SLA Tab

*Configuration > Templates & Policies > TCAs > IP SLA*

*Monitoring > Performance > IP SLA Summary*

Using a polling process, **IP SLA** (Internet Protocol Service Level Agreement) tracking provides the ability to generate specific network actions that are completely dependent on the state of an IP interface or tunnel. The goal is to prevent black-holed traffic. For example, associated IP subnets could be removed from the subnet table and also from subnet sharing if the LAN-side interfaces on an appliance go down.

This tab displays all IP SLA rules configured on the selected appliances. To add or modify rules, click the edit icon to the left of any row in the table. Click the Realtime and Historical Charts icon to view IP SLA trends over time for an interface or tunnel. You can view trends for both latency and loss.

> **NOTE:** For 9.6.0 or later deployments, your IP SLA Rule Destination addresses must be compatible with IPv6 if you want to use IPv6 local breakout addressing. The following IP SLA internet endpoints are recommended:
>
> `192.151.28.254,2600:9000:a60f:6c50:ca04:acb1:b183:9524,2600:9000:a70d:506e:85a8:bd96:7482:16,sp-ipsla.silverpeak.cloud`
>
> Replace the contents of the **Address** field on the IP SLA Rule Destination dialog box with these endpoints as one continuous string. For details, see Business Intent Overlays.

*See* https://arubanetworking.hpe.com/techdocs/sdwan/docs/orch/configuration/policy/ipsla/.

112. The '845 Accused Products include processors that can be used to, based on the comparison, determine that at least one of the at least two parameters, such as calculated loss/percentage loss or calculated latency/average latency/RTT, meets or exceeds at least one of the two or more performance metric thresholds and, in response, determine that performance over the first bidirectional communication path is degraded. For example, when calculated loss/percentage loss or calculated latency/average latency/RTT for the first bidirectional communication path crosses the applicable Loss or Latency threshold, the processor determines that performance over that first path is degraded.

113. The '845 Accused Products include processors that can be used to, based on the degraded performance determination, move, in real-time, at least one of the data signals and the control signals associated with the communication session from the first bidirectional communication path to the second bidirectional communication path. For example, Aruba explains that EdgeConnect automates traffic steering across underlying WAN transport services, that

64

optimal path choices are based on packet-level link-quality characteristics including delay, loss, and jitter, and that EdgeConnect can immediately and efficiently steer flows to the best route. Aruba's BIO/IP SLA materials state that EdgeConnect checks whether IP SLA thresholds have been crossed and, at the configured IP SLA status interval, makes decisions to move a tunnel in or out of service. Aruba's Route Policies materials further state that when multiple tunnels exist to a remote peer, the appliance can dynamically select the best path based on criteria including load balancing, lowest loss, lowest latency, a preferred interface, or a specific tunnel. Because EdgeConnect steers traffic at the flow level, movement of the flow to the second bidirectional communication path includes packets belonging to that flow, including TCP data packets and associated TCP control packets that share the flow's source and destination IP addresses, ports, and protocol. Accordingly, when returned monitoring/test-packet information indicates that the first bidirectional communication path has degraded and another eligible path remains available, EdgeConnect moves the session's flow traffic, including data packets and associated active-session TCP control traffic, to the second path in real time.



*See* https://arubanetworking.hpe.com/techdocs/VSG/docs/070-sd-branch-design/esp-sd-branch-design-040-solution-overview-ec/.

| Feature | Description |
|---|---|
| End to End FIN Handling | This feature helps to fine tune TCP behavior during a connection's graceful shutdown event. When this feature is **ON** (Default), TCP on the local appliance synchronizes this graceful shutdown of the local LAN side with the LAN side of the remote appliance. When this feature is **OFF** (Default TCP), no such synchronization happens and the two LAN segments at the ends gracefully shut down, independently. |
| IP Block Listing | If selected, and if the appliance does not receive a TCP SYN-ACK from the remote end within five seconds, the flow proceeds without acceleration and the destination IP address is blocked for one minute. |
| Keep Alive Timer | Allows changing the Keep Alive timer for the TCP connections. **Probe Interval:** Time interval in seconds between two consecutive Keep Alive probes. **Probe Count:** Maximum number of Keep Alive probes to send. **First Timeout (Idle):** Time interval until the first Keep Alive timeout. |
| LAN Side Window Scale Factor Clamp | This setting allows the appliance to present an artificially lowered Window Scale Factor (WSF) to the end host. This reduces the need for memory in scenarios in which there are many out-of-order packets being received from the LAN side. These out-of-order packets cause much buffer utilization and maintenance. |
| Per-Flow Buffer | (**Max LAN to WAN Buffer** and **Max WAN to LAN Buffer**) This setting clamps the maximum buffer space that can be allocated to a flow, in each direction. |
| Persist timer Timeout | Allows the TCP to terminate connections that are in Persist timeout stage after the configured number of seconds. |
| Preserve Packet Boundaries | Preserves the packet boundaries end-to-end. If this feature is disabled, the appliances in the path can coalesce consecutive packets of a flow to use bandwidth more efficiently. It is enabled by default so that applications requiring packet boundaries to match do not fail. |
| Route Policy Override | Tries to override asymmetric route policy settings. It emulates auto-opt behavior by using the same tunnel for the returning SYN+ACK as it did for the original SYN packet. Disable this feature if the asymmetric route policy setting is necessary to correctly route packets. In this case, you might need to configure flow redirection to ensure optimization of TCP flows. |
| Slow LAN Defense | Resets all flows that consume a disproportionate amount of buffer and have a very slow throughput on the LAN side. Owing to a few slower end hosts or a lossy LAN, these flows affect the performance of all other flows so that no flows see the customary throughput improvement gained through TCP acceleration. This feature is enabled by default. The number relates indirectly to the amount of time the system waits before resetting such slow flows. |

*See* https://arubanetworking.hpe.com/techdocs/sdwan/docs/orch/configuration/templates/opt-policies/.

## Set Actions Fields

The Route Policy template's SET actions determine where to direct traffic and what the fallback is when a tunnel is down.

### Where the Appliance Directs Traffic

- In the **Destination** field, you specify how to characterize the flow. The options are a specific overlay, **auto-optimized**, **pass-through** [shaped], **pass-through-unshaped**, or **drop**ped.

- When **auto-optimized**, a flow is directed to the appropriate tunnel. If you choose, you can specify that the appliance use metrics to dynamically select the best path based on one of these criteria:

  - Load balancing
  - Lowest loss
  - Lowest latency

- When configuring the Route Policy for an **individual** appliance when multiple tunnels exist to the remote **peer**, you can also select the path based on a preferred interface or a specific tunnel.

### How Traffic Is Managed If a Tunnel Is Down

- The **Fallback** can be **pass-through** [shaped], **pass-through-unshaped**, or **drop**ped.

- When configuring the Route Policy for an **individual** appliance, the **continue** option is available if a specific tunnel is named in the **Destination** column. That option enables the appliance to read subsequent entries in the individual Route Policy in the event that the tunnel used in a previous entry goes down.

*See* https://arubanetworking.hpe.com/techdocs/sdwan/docs/orch/configuration/templates/route-policies/.

67

Service Level Objective (SLO)

Traffic is routed through the primary interfaces exclusively until the Service Level Objectives (SLOs) for Loss, Latency, or Jitter have been exceeded. If this occurs, backup interfaces are added to the overlay to help meet the specified SLO.

You should configure SLOs based on the tolerance of the application to network performance. You should not configure SLOs based on the type of network or expected performance of the network itself. SLOs are about the application, not the network. For example, for voice SLOs most customers find 250ms Latency, 50ms Jitter, and 10% Loss to be acceptable parameters.

For High Availability and High Quality "waterfall" overlay modes, when an underlay violates the Loss SLO, the underlay is not removed from the overlay until the overlay itself violates the SLO. For High Throughput and and High Efficiency "balanced" modes, when an underlay violates the Loss SLO, it is immediately removed from the overlay. The Exclude Links BIO setting controls this behavior and can be modified using the Custom link bonding policy.

The Exclude Links setting does not apply to Latency or Jitter SLOs. Those SLOs always operate with Exclude Links set to "on Underlay Brownout".

**NOTE:** If all links are in violation of SLOs, the system acts as if no SLO is configured and all links are configured as primary.

*See* https://arubanetworking.hpe.com/techdocs/sdwan/docs/orch/configuration/overlays/bios/.

Break Out Locally Using These Interfaces, Available Interfaces, and Link Selection

· You can select the best internet breakout links by specifying the type of Link Selection; either **Waterfall** or **Balanced**.

   · If **Waterfall** is selected, links are ranked on the selected threshold, from best to worst, using an inference system that averages performance of all SDWAN fabric tunnels associated with a given label. In Waterfall mode, flows are routed across the best label until bandwidth utilization is above 80%. Once 80% utilization is reached flows will "waterfall" to the next-best label. For more information about Waterfall mode, see Internet Breakout Trends.

   · If **Balanced** is selected, flows are subjected to a weighted load-balancing algorithm. The weighting is proportional to the available bandwidth of the link.

   · For both **Waterfall** and **Balanced**, if a threshold is configured for **Loss**, **Latency**, or **Jitter**, the system removes the link from Local Breakout eligibility when it exceeds the threshold.

· You can choose to set IP SLA Rule destinations.

· If you select the **Threshold-based Failover** check box, the Preferred Policy Order is applied when all links violate the configured threshold. This setting is useful when you want the system to backhaul traffic during Local Breakout threshold violation. When this check box is cleared, all Local Breakout labels must be down for flows to fall to the next policy.

· For Local Breakout flows, the system uses session affinity to attempt to keep flows with the same source and destination IPs on the same link. You can change the session affinity timeout.

*See* https://arubanetworking.hpe.com/techdocs/sdwan/docs/orch/configuration/overlays/bios/.

69



| | |
|---|---|
| Loss | The system uses these values as thresholds when calculating percentage loss to determine if the passthrough tunnels are "up" or "down".<br><br>**Mark Up after loss below X%** – Enter a percentage. The system marks the status of the tunnels as "up" if the percentage loss calculated from the best performing destination is below this threshold.<br><br>**Mark down after loss above X%** – Enter a percentage. The system marks the status of the tunnels as "down" if the percentage loss calculated from the best performing destination exceeds this threshold. This means that all destinations in the Address field must have crossed this threshold for the system to invoke the "down" status. |
| Latency | The system uses these values as thresholds when calculating average latency to determine if the passthrough tunnels are "up" or "down". These values are measured in milliseconds.<br><br>**Mark Up after average latency below X** – Enter a numeric value. The system marks the status of the tunnels as "up" if the average latency calculated from the best performing destination is below this threshold.<br><br>**Mark Down after average latency above X** – Enter a numeric value. The system marks the status of the tunnels as "down" if the average latency calculated from the best performing destination exceeds this threshold. This means that all destinations in the Address field must have crossed this threshold for the system to invoke the "down" status. |
| Loss OR Latency, Loss AND Latency | Select one of two options for combining the Loss and Latency metrics.<br><br>**OR** – The system marks the status of the tunnels as "down" if either the Loss or the Latency thresholds are crossed.<br><br>**AND** – The system marks the status of the tunnels as "down" if both the Loss and Latency thresholds are crossed. |
| Check IP SLA status every | How frequently EdgeConnect checks to see if the thresholds have been crossed. This is also how frequently a decision is made to move a tunnel in or out of service or to raise an IP SLA Down alarm. 30 seconds is the default. Setting this value much lower could cause false positives or tunnel flapping. |
| Route Label | Select a route label to apply to this orchestration. Orchestrator will automatically revoke routes with this route label. You can use this feature to add a static default route that will be revoked without needing to create an IP SLA rule.<br><br>Depending on the IP SLA Condition set for the route label, the route will be marked DOWN if *any* of the IP SLA rules are DOWN or only when *all* IP SLA rules associated with the label are DOWN.<br><br>See Route Labels. |

*See* https://arubanetworking.hpe.com/techdocs/sdwan/docs/orch/configuration/overlays/bios/.

69



| Field | Description |
|---|---|
| Classification | Classify flows in two ways:<br><br>**Zone-level:** Flows originating from multiple endpoints that are part of a single firewall zone.<br><br>**Source-level:** All flows originating from a single endpoint or source device. |
| Metric | DoS thresholds can be configured with any or all of the four metrics available in a firewall protection profile:<br><br>**Flows per second:** Rate of flow (fps). A single flow is a unidirectional set of packets containing common attributes (source and destination IP, ports, protocols).<br><br>**Concurrent Flows:** Number of flows that are active at a given point in time.<br><br>**Embryonic Flows:** An incomplete TCP connection where only the first step in the three-way handshake has been completed; the EdgeConnect has received the SYN packet from the requesting client. For other protocols, such as UDP or ICMP or other, this indicates uni-directional traffic and the flow is called Embryonic.<br><br>**Embryonic Two-Way flows:** A half-open TCP connection occurs when only the SYN and SYN-ACK packets of the three-way handshake are completed. In this state, EdgeConnect has received the SYN-ACK from the server, but it has not received the final ACK from the Client. |
| IP Protocol | Select an IP protocol (**TCP**, **UDP**, **ICMP**, **Others**, or **All**) for use in threshold settings. |
| Min Label | Select the method used to determine the min value:<br><br>**Baseline:** If selected, the min value is determined by the system using baseline learning, and the corresponding Value field shows "Dynamic". This option is available only if Baseline Learning is enabled.<br><br>**Custom:** If selected, you configure the min value by entering a percentage in the corresponding Value field. |
| Value | Minimum threshold value as a percentage of target appliance flow capacity. When this value is breached, the protection profile takes a corresponding minimum action. If Baseline is selected as the Min Label, the system determines this value, and it cannot be configured. |
| Action | Action to take when the min value is breached (**Log**, **Rapid aging**, **Drop excess**, or **Block source**). Because this corresponds to the min value, less intensive action can be configured. |

*See* https://arubanetworking.hpe.com/techdocs/sdwan/docs/orch/configuration/overlays/fw-protection-profiles/.

114.    To the extent any step of the claimed method is performed by HPE's customers, end users, partners, distributors, consultants, service providers, or other third parties, such performance is attributable to HPE. HPE controls or directs the configuration, deployment, operation, monitoring, optimization, validation, support, and troubleshooting of the '845 Accused Products through its EdgeConnect SD-WAN software, SD-WAN Orchestrator, Business Intent Overlay configuration requirements, deployment guides, user guides, technical-support materials, training materials, professional-services deployments, certification and validation activities, and customer-support practices. HPE conditions customers' and end users' receipt of the benefits of the accused SD-WAN path-monitoring and path-optimization functionality on configuring and operating the accused products in the manner specified by HPE, including the manner and timing of path measurements, threshold settings, failure-detection behavior, path selection, traffic

steering, and session-continuity operations. HPE receives a benefit from such use, including revenue from sales, licenses, subscriptions, support, services, maintenance, and continued customer adoption of the '845 Accused Products. Accordingly, all steps of the asserted method claims are performed by HPE or are attributable to HPE under HPE's direction or control.

115. On information and belief, each of the '845 Accused Products has been available for purchase in the United States, including but not limited to, directly from HPE, through HPE's website, and/or through HPE-authorized Americas distributors. By way of example only, HPE's U.S. store has listed HPE Aruba Networking EdgeConnect SD-WAN gateway products, including EdgeConnect 10150, 10106, 10108, 10104, and EC-S-P SD-WAN Gateway products, with options to add products to cart and/or request quotes. *See* https://buy.hpe.com/us/en/networking/networking-gateways/sd-wan-platforms/hpe-aruba-networking-edgeconnect-sd-wan/p/1014658646.

116. HPE's infringement of the '845 Patent is and has been knowing, deliberate, and willful, since at least May 6, 2026, and not later than the filing date of this Complaint.

117. Since at least May 6, 2026, and not later than the filing date of this Complaint, HPE, knowing the '845 Accused Products infringe the '845 Patent and with specific intent for others to infringe the '845 Patent, has induced infringement of, and continues to induce infringement of, one or more claims of the '845 Patent under 35 U.S.C. § 271(b), either literally and/or under the doctrine of equivalents, at least by actively inducing others, including its distributors, customers, end-users, vendors, labs, service providers and contractors, training partners and instructors, partners, consultants, and/or other third parties, to make, use, sell, offer to sell, import, configure, deploy, operate, monitor, and/or troubleshoot in or into the United States without authorization the '845 Accused Products. HPE knowingly and intentionally instructs such third parties to infringe

71

at least through user manuals, product documentation, configuration guides, deployment guides, technical-support materials, and other materials, including without limitation HPE Aruba Networking EdgeConnect SD-WAN documentation located on HPE's website. HPE knowingly and intentionally encourages, instructs, causes, and facilitates infringement through the use, importation, sale, license, offer for sale, deployment, configuration, monitoring, troubleshooting, support, and operation of the '845 Accused Products by its distributors, customers, end users, vendors, labs, service providers and contractors, training partners and instructors, partners, consultants, and/or other third parties, and through end users' use of the '845 Accused Products in the United States.

118. Since at least May 6, 2026, and not later than the filing date of this Complaint, HPE further induced infringement by encouraging its distributors, customers, end-users, vendors, labs, service providers and contractors, training partners and instructors, partners, consultants, and end users of the '845 Accused Products in the United States through marketing, providing information such as detailed installation guides supporting use of the EdgeConnect SD-WAN and promoting its features, specifications, and applications; and providing technical documentation for the EdgeConnect SD-WAN, including user guides, deployment guides, configuration guides, system-requirements materials, and reference materials describing how to implement, optimize, monitor, and test EdgeConnect SD-WAN; and providing commercial and customer support services.

119. PulseLink has sustained and is entitled to recover damages as a result of HPE's past and continuing infringement, in an amount adequate to compensate for HPE's infringement, but in no event less than a reasonable royalty for the use made of the invention, together with interest and costs as fixed by the Court.

120. HPE's infringement of the '845 Patent is and has been knowing, deliberate, and willful, since at least May 6, 2026, and not later than the filing date of this Complaint. Despite HPE's knowledge of the '845 Patent, HPE continued and continues to commit acts of direct and indirect infringement despite knowing its actions constitute infringement of the valid and enforceable '845 Patent, despite a risk of infringement that was known or so obvious that it should have been known to HPE, and/or even though HPE otherwise knew or should have known that its actions constituted an unjustifiably high risk of infringement of that valid and enforceable patent.

121. Under these circumstances, HPE's conduct is and has been egregious. HPE's knowing, deliberate, and willful infringement of the '845 Patent entitles PulseLink to increased damages under 35 U.S.C. § 284, and attorneys' fees and costs from prosecuting this action under 35 U.S.C. § 285.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the following relief:

a) A judgment that HPE has infringed, directly and indirectly, by way of inducement, literally and/or under the doctrine of equivalents, one or more claims of each of the Asserted Patents;

b) A judgment that HPE's infringement of the Asserted Patents has been and continues to be willful;

c) An award of damages adequate to compensate PulseLink for HPE's infringement of the Asserted Patents under 35 U.S.C. § 284, including damages for past infringement and any continuing infringement through entry of final judgment, in no event less than a reasonable royalty, together with supplemental damages for any infringement not included in the jury's verdict;

d) An award of enhanced damages, including treble damages, under 35 U.S.C. § 284 based on HPE's willful infringement;

e)	An award of pre-judgment and post-judgment interest on all damages awarded to PulseLink, at the maximum rate permitted by law;

f)	A judgment and order requiring HPE to pay PulseLink an ongoing royalty or compulsory ongoing licensing fee, in an amount to be determined by the Court, for any continued infringement of the Asserted Patents after entry of judgment;

g)	To the extent equitable relief is warranted, an injunction barring HPE and its officers, directors, agents, servants, employees, affiliates, attorneys, parents, subsidiaries, divisions, successors, assigns, and all others acting in privity or concert with them from further acts of infringement of the Asserted Patents;

h)	A declaration that this case is exceptional under 35 U.S.C. § 285;

i)	An award of PulseLink's attorneys' fees, costs, and expenses incurred in this action under 35 U.S.C. § 285 and any other applicable law; and

j)	Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), PulseLink hereby demands trial by jury on all issues raised by the Complaint.

Dated: June 15, 2026

/s/ Charles C. Koole
Paul J. Skiermont (TX Bar No. 24033073)
Alexander E. Gasser (WI Bar No. 1022659)
Steven W. Hartsell (TX Bar No. 24040199)
SKIERMONT DERBY LLP
1601 Elm Street, Suite 4400
Dallas, TX 75201
Phone: (214) 978-6600
Fax: (214) 978-6601
pskiermont@skiermontderby.com
agasser@skiermontderby.com
shartsell@skiermontderby.com

Rex Hwang (CA Bar No. 221097)
Charles C. Koole (CA Bar No. 259997)
SKIERMONT DERBY LLP
633 W. Fifth Street, Suite 5800
Los Angeles, CA 90071
Phone: (213) 788-4500
Fax: (213) 788-4545
rhwang@skiermontderby.com
ckoole@skiermontderby.com

*Attorneys for Plaintiff*
PulseLink Systems, LLC